James L. WAGNER, David N. Pragar, Barbara T. Pragar, Thomas Pragar and Thomas J. Pragar, Appellants,

v.

ESTATE OF Leona FOX, Deceased and Larry Smith, Appellees.

No. 15A01–9809–CV–346.

Court of Appeals of Indiana.

Sept. 27, 1999.

 

Frank C. Capozza, Offer Korin, Katz & Korin, P.C., Indianapolis, Indiana, Attorneys for Appellants.

William R. Pfister, Lawrenceburg, Indiana, Attorney for Appellee Estate of Leona Fox.

Terrill D. Albright, David L. Hanselman, Jr., Baker & Daniels, Indianapolis, Indiana, Attorneys for Appellee Larry Smith.

## OPINION

MATTINGLY, Judge

David N. Pragar, Barbara T. Pragar, Thomas Pragar and Thomas J. Pragar (collectively "the Pragars") and James L. Wagner appeal from the trial court's denial of their request for specific performance of certain real estate purchase agreements. They raise a number of issues on appeal, which we consolidate and restate as:

1. Whether the trial court abused its discretion by not enforcing the purchase agreements;

2. Whether the trial court's findings are supported by the evidence; and

3. Whether the trial court properly applied the doctrine of laches.

Affirmed.

## FACTS AND PROCEDURAL HISTORY

On August 22, 1970, Leona Fox ("Leona") entered into a revocable trust agreement ("the Trust") with the American State Bank ("the Bank"). The primary asset of the Trust was a large tract of land that Leona owned in Dearborn County, Indiana ("the Fox farm"). Under the Trust, Leona conveyed title to all of her real and personal property to the Bank and empowered the Bank to "sell, convey, mortgage, or otherwise encumber" real estate on her behalf. R. at 53, 55.

The Trust originally provided that all of the Trust's assets were to be distributed equally to Leona's children—Everett Fox, Patrick Fox ("Patrick"), Camilla Fox and Marie Miller—upon Leona's death. In 1973, however, Leona executed a will in which she left Patrick only $100 and specified that the rest of her estate was to be distributed in equal shares to her other three children. Leona amended the Trust in 1975 to state that, upon her death, the Trust's assets should be distributed according to her will.

By the early 1980s, the assets of the Trust had been depleted. In 1981, the Bank contracted with Grady Realtors ("Grady") to sell 220 acres of the Fox farm for $200,000. The original listing agreement did not include a house, a barn and approximately 10 acres of land upon which these buildings were located. Norman Gellert was the listing agent for Grady. On April 12, 1983, the Bank used the Fox farm to secure repayment of a $40,000 loan from Dearborn Savings Association.

Between 1981 and 1984, Grady received nine offers on the Fox farm, all of which were rejected by the Bank as trustee. Because the property had not sold, Gellert recommended that the land be divided into four parcels: Parcel A, Parcel B, Parcel C, and Parcel D. Parcel D included the dwelling, buildings and 10 acres which had not previously been on the market. The Bank then relisted the Fox farm for sale as four separate parcels.

Thomas Pragar and Thomas J. Pragar[1] became interested in part of the Fox farm through the efforts of Bob Davidson, another Grady broker. On June 2, 1984, Thomas Pragar and Thomas J. Pragar signed an offer to purchase Parcel C for $44,000 and Parcel B[2], which consisted of approximately 25 acres, for $1,100 per acre. This purchase offer, which was written by Davidson, was accepted by the Bank as trustee on June 4, 1984. Also on June 2, 1984, David N. Pragar[3] and his wife Barbara Pragar executed an offer to purchase Parcel B–1 for $1,100 per acre. The Trustee accepted this offer, which was also written by Davidson, on June 2, 1984. On June 4, 1984, Thomas Pragar and Thomas J. Pragar paid Grady $4,000 in earnest money. David N. Pragar and Barbara Pragar each paid Grady $1,000 in earnest money. The closings on all the Pragars' contracts were scheduled on or before July 15, 1984.

On April 9, 1984, Patrick died. On June 25, 1984, three weeks after the Trustee accepted the Pragars' offers to purchase the parcels of the Fox farm, Patrick's widow, Anna, filed suit against Leona, seeking specific performance of an alleged contract between Anna, Patrick and Leona for ownership of the Fox farm. This lawsuit created a cloud on the title to the Fox farm and prevented the Pragars' purchase contracts from closing as scheduled on July 15, 1984. This closing date was never extended by the parties in writing.

Leona died on April 3, 1985. On September 27, 1985, Patrick's heirs filed a will contest against the Bank and Anna filed another action against Leona's estate. Because the Fox family litigation delayed closing on the land contracts, the Pragars and the Trustee entered into an agreement with Grady to hold the Pragars' earnest money deposit in an interest-bearing account.

Through Davidson, Wagner executed an offer to purchase Parcel A of the Fox farm on May 2, 1986. This offer was accepted by the Trust officer on May 7, 1986. Wagner's contract contained a clause which stated that Wagner would obtain a commitment for financing "on or before 30 days after the clearance of legal problems." He paid Grady $3,000 in earnest money. Wagner's contract specified a closing date of September 2, 1986. However, the transaction did not close by that date. Neither was the closing date extended in writing.

By 1986, the Trust had no assets other than the Fox farm. Consequently, the Trust defaulted on payments on the loan from Dearborn Savings. On September 15, 1986, Dearborn Savings filed a mortgage foreclosure action. A decree of foreclosure ordering the Fox farm to be sold was entered on October 30, 1987. Both Gellert and Davidson were aware of the foreclosure action.

In May 1988, Davidson called the Pragars and advised them they should send a letter to the Bank to let the Bank know what their intentions were regarding the parcels of the Fox farm. On May 30, 1988, the Pragars sent two handwritten notes to the Bank, reaffirming their intention to purchase the property. On June 1, 1988, Wagner sent out a similar letter. On June 17, 1988, Anna purchased the judgment of foreclosure from Dearborn Savings. On June 21, 1988, Anna voluntarily stayed a scheduled sheriff's sale.

In 1990, West Shell Realtors ("West Shell"), the successor to Grady, informed the Pragars and Wagner that it no longer wished to hold their earnest money and advised them to deposit it with the county clerk. West Shell made out a check payable for $12,873.61, which represented the

1. Thomas Pragar is the father of Thomas J. Pragar.

2. Parcel B was subdivided into two parcels, B and B–1.

3. David N. Pragar is the brother of Thomas Pragar.

Pragars' and Wagner's earnest money of $9,500 plus interest. That check was eventually deposited in the Dearborn Circuit Court.

On November 27, 1991, this court issued a memorandum decision, affirming the Dearborn Circuit Court's judgment against Anna in her lawsuit against the Bank as trustee of Leona's estate and other parties. Subsequently, on September 9, 1993, the Bank filed a petition to sell the Fox farm. Notices of hearing were sent to all interested parties. The Pragars and Wagner immediately filed objections, as did some of Leona's heirs. On March 24, 1994, the trial court found that the Bank owned the real estate as trustee and ordered it to distribute the property in accordance with the Indiana Trust Code. On May 20, 1994, the Bank requested the trial court to find that the Pragar and Wagner land contracts were void and unenforceable so that the land could be sold at sheriff's sale pursuant to Dearborn Savings' decree of foreclosure. The trial court ordered that the Pragar and Wagner purchase agreements "remain valid contracts." R. at 318.

The Bank filed a motion to correct error on July 29, 1994, seeking to avoid completion of the Pragars' and Wagner's purchase agreements. The trial court granted the Bank's motion to correct error on November 1, 1994. The Pragars and Wagner then filed their own motions to correct error, which the trial court denied on February 6, 1995. The Pragars and Wagner appealed that decision. This court affirmed the trial court's decision in an unpublished opinion, *Wagner v. Estate of Leona Fox*, No. 15A01–9503–CV–60 (Ind. Ct.App. Nov. 29, 1995).

On March 13, 1995, Anna assigned her judgment of foreclosure on the Fox land to Larry Smith for $115,000. Anna's three daughters also approached Smith and asked him if he would be interested in buying their interest in the Fox property. Under Leona's will, Anna's daughters were only entitled to receive $100 each. However, Smith offered them $10,000 for their interest in the Fox farm—$100 cash up front and $9,900 to be paid if Smith acquired 100 percent ownership of the Fox farm. Smith executed purchase agreements to that effect with Anna's daughters in March of 1995.

Everett Fox's children then approached Smith to inquire whether he wanted to buy their interest in the property. On July 9, 1996, all of Everett Fox's children assigned their interest in the Fox farm to Smith for $1,000 cash up front and $9,000 to be paid when Smith acquired free and clear fee simple title to the property. In February of 1997, Smith entered into a similar agreement with Leona's daughters, Camilla Fox and Marie Miller, whereby he paid them $30,000 each up front for their interest in the Fox farm and promised to pay them each an additional $25,000 once he obtained all the interest therein.

Because he had acquired most of the outstanding interests in the Fox farm from Leona's heirs, Smith intervened in the litigation which is the subject of this appeal on July 11, 1996. By agreement of the parties, the trial court scheduled a full hearing on all issues for March 24, 1998. On March 16, 1998, the Pragars and Wagner requested the trial court to enter specific findings of facts and conclusions of law under Ind. Trial Rule 52(A).

On March 24 and 25, 1998, the trial court held a bench trial on the validity and enforceability of the Pragar and Wagner real estate contracts. On June 25, 1998, the trial judge denied the Pragars' and Wagner's request for specific performance, based on twelve conclusions of law, which we summarize as follows:

1. Time was of the essence in the purchase agreements;

2. Even if time was not of the essence, the law implies a reasonable time for performance, and nine years is an unreasonably long period of time to wait to enforce a contract for the sale of land;

3. The Pragars and Wagner waited an unreasonable length of time to conclude their purchase agreements;

4. Wagner's purchase agreement did not adequately describe the land Wagner was purchasing and therefore did not satisfy Indiana's Statute of Frauds;

5. The claims for specific performance were barred by the equitable doctrine of laches; and

6. Specific performance of the land contracts would be inequitable.

R. at 641–48. This appeal ensued.

## STANDARD OF REVIEW

■ The Pragars and Wagner requested the trial court to enter Findings of Facts pursuant to Ind. Trial Rule 52(A), which provides that "[o]n appeal of claims tried by the court without a jury ... the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In applying this rule, we employ a two-tiered standard of review. *OVRS Acquisition Corp. v. Community Health Servs., Inc.*, 657 N.E.2d 117, 123–24 (Ind.Ct.App.1995). First, we consider whether the evidence supports the findings, construing the findings liberally in support of the judgment. *Id.* at 124. The findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. *Id.*

■ Next, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions thereon. *DeHaan v. DeHaan,* 572 N.E.2d 1315, 1320 (Ind.Ct.App.1991). In applying this standard, we will neither reweigh the evidence nor judge the credibility of the witnesses. *Donavan v. Ivy Knoll Apts. Partnership,* 537 N.E.2d 47, 50 (Ind.Ct.App.1989). Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* We must affirm the judg-

ment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.*

## DECISION AND DISCUSSION

1. *Specific Performance*

■ The Pragars argue the trial court erred by not enforcing specific performance of the purchase agreements. Specific performance is a matter of course in contracts involving the purchase of real estate. *New Life Community Church of God v. Adomatis,* 672 N.E.2d 433, 438 (Ind.Ct.App.1996). This is because each piece of real estate is considered unique, without an identical counterpart anywhere else in the world. *Unger v. Indiana & Mich. Elec. Co.,* 420 N.E.2d 1250, 1261 (Ind.Ct.App.1981); *Bauermeister v. Sullivan,* 87 Ind.App. 628, 634, 160 N.E. 105, 107 (1928). However, specific performance is not available as a matter of right but rests with the sound discretion of the trial court. *Lewandowski v. Beverly,* 420 N.E.2d 1278, 1280 (Ind.Ct.App.1981). Such judicial discretion is not arbitrary but is governed by and must conform to the well-settled rules of equity. *Id.* We will find an abuse of discretion where the trial court's decision is clearly against the reasonable deductions which may be drawn from the facts before the court. *Ridenour v. France,* 442 N.E.2d 716, 718 (Ind.Ct.App.1981). Because an action to compel specific performance sounds in equity, particular deference must be given the judgment of the trial court. *Smith v. Potter,* 652 N.E.2d 538, 542 (Ind.Ct.App.1995).

■ The trial court based its denial of specific performance on numerous conclusions of law. On appeal,

[t]he reviewing court will affirm if the judgment can be sustained on any legal theory supported by the evidence most favorable to the judgment, together with all reasonable inferences to be drawn therefrom. Where trial court findings on one legal theory are adequate, find-

ings on another legal theory amount to mere surplusage and cannot constitute the basis for reversal even if erroneous. *Barrington Management Co., Inc. v. Paul E. Draper Family Ltd. Partnership,* 695 N.E.2d 135, 140 (Ind.Ct.App.1998) (citation omitted). Therefore, if even one of the trial court's reasons is not clearly erroneous, the judgment should be affirmed. We will address whether the trial court was correct in ruling that specific performance of the purchase agreements would violate the basic principles of equity.[4]

 Specific performance is an equitable remedy; thus, the power of a court to compel specific performance is an extraordinary power. *Buckmaster v. Platter,* 426 N.E.2d 148, 150 (Ind.Ct.App.1981). In this case, the trial court found that the enforcement of the Pragar and Wagner contracts as they were written in 1984 and 1986 would be inequitable. We agree.

 Our supreme court has long recognized the general rule that a party who seeks specific performance of a contract is obliged to take all reasonable steps to assert his or her contractual right. *See, e.g., Vawter v. Bacon,* 89 Ind. 565, 569 (1883); *Mather v. Scoles,* 35 Ind. 1, 9 (1870). This is because equity aids the vigilant, not those who sleep on their rights. *Vaughn v. Schnitz,* 673 N.E.2d 501, 503 (Ind.Ct. App.1996).

The Pragars and Wagner did little to advance the closing of their land contracts. They never filed any documentation with the county recorder to make their interests in the land a matter of public record. They made no independent investigation concerning the real estate. They waited until 1993, when the Bank filed its petition to sell the Fox farm, to take any formal action to close on the property or to seek specific performance of their contracts.

The Pragars and Wagner argue they did not do anything to advance the closing of their contracts because they had no obligation to do so. However, under the *Vawter* standard, the issue is not what the Pragars and Wagner were required to do but rather whether they took all reasonable steps to assert their rights under the contracts. The Pragars and Wagner could have intervened in the litigation involving Anna Fox and the Bank to protect their interest in the property. They could have filed an independent action against the Bank for specific performance of their contracts. Instead, the Pragars and Wagner waited for over seven years to assert the validity and enforceability of their contracts. The evidence supports the trial court's conclusion that the Pragars and Wagner were less than diligent in asserting their rights under the purchase agreements.

Compelling specific performance of these contracts would also be inequitable because the Pragars and Wagner did nothing to protect the value of the Fox land. Other than their earnest money and the costs of the instant litigation, they have not invested anything in the pieces of property. In contrast, Smith paid back taxes on the property, has kept taxes current, has installed fencing on the farm, and has cut hay on and bush-hogged the land. We will not disturb the trial court's finding that Smith has a greater equitable claim to this land than do the Pragars and Wagner.

Further, the trial court was correct in noting that the Pragars and Wagner would receive a windfall if their contracts were specifically enforced. If they were granted specific performance, the Pragars and Wagner would purchase the Fox land for the price bargained for in 1984 and 1986, which was $186,018. Thomas Pragar ad-

---

4. Because we affirm the trial court's conclusion that enforcement of the purchase agreements and specific performance would violate basic principles of equity, we need not address Wagner's and the Pragars' allegations that the trial court erred in finding that time

was of the essence in the contracts and that the contracts were not performed within a reasonable time. We also need not address their allegation that the trial court erred in finding that Wagner's contract did not meet the requirements of the Statute of Frauds.

mitted that the land has at least doubled in value since the mid–1980s. R. at 797–98. In contrast, the Pragars and Wagner have had use of their earnest money, which has increased in value from $9,500 to $12,873.61. Thus, ordering specific performance would create a scenario under which the purchase price of the land had remained constant while the earnest money and the money available for a down payment have increased in value. The trial court did not err in finding that specific performance of the purchase agreements would result in inequity.

Finally, the Pragars and Wagner note that a party seeking equitable relief must come into court with clean hands. *Foursquare Tabernacle Church of God in Christ v. Department of Metro. Dev. of Consol. City of Indianapolis,* 630 N.E.2d 1381, 1385 (Ind.Ct.App.1994). They argue that Smith and the Fox heirs have come to court with unclean hands.

 The doctrine of unclean hands is not favored by the courts and must be applied with reluctance and scrutiny. *Id.* For the unclean hands doctrine to apply, the party who is charged with having unclean hands must be guilty of intentional misconduct. *Tomahawk Village Apts. v. Farren,* 571 N.E.2d 1286, 1294 (Ind.Ct. App.1991). Our review of the record indicates that neither Smith nor the Bank is guilty of any intentional misconduct which would justify application of the doctrine of unclean hands. Thus, the trial court did not err when it did not apply the doctrine of unclean hands against Smith or the Bank.

### 2. *Findings of Fact*

 The Pragars and Wagner argue that the trial court's findings of fact 22 through 25 are clearly erroneous.[5] Findings of fact are clearly erroneous only if the record lacks any facts or reasonable

---

[5] The Pragars and Wagner appear to challenge only the factual accuracy of these findings; they do not argue that the findings do not support the trial court's judgment. We

inferences to support them. *Vanderburgh County Bd. of Comm'rs v. Rittenhouse,* 575 N.E.2d 663, 665 (Ind.Ct.App.1991). When determining whether findings of fact are clearly erroneous, we will consider only the evidence most favorable to the judgment and the reasonable inferences arising therefrom. *Id.* at 665–66. We will address each of the court's findings separately.

### A. *Finding of Fact No. 22*

Finding of fact No. 22 provides:

There was no evidence proffered that American State Bank or its attorney was given notice of the West Shell termination of the earnest money account, that the money was deposited with the Clerk of Dearborn Circuit Court, or that the Pragars and Wagner petitioned the Court to place the $12, 873.63 in an interest bearing account or that [that] petition was granted.

R. at 638.

The Pragars and Wagner contend this finding of fact is erroneous because, since West Shell knew of the transfer of the earnest money deposit, that knowledge can be imputed to the Bank, for which West Shell was acting as agent. However, the trial court's finding only states that the Bank was not given notice, not that the Bank did not have imputed knowledge of the transfer. The Pragars and Wagner have not shown this finding is clearly erroneous.

### B. *Finding of Fact No. 23*

Finding of fact No. 23 states:

At no time during the period from May 31, 1988 to and including May 8, 1992, did the Pragars and Wagner employ an attorney to represent them for the purpose of asserting their interests in the

---

thus address only the question whether the findings are supported by the evidence of record or the reasonable inferences which might be drawn from that evidence.

Leona Fox Farm or to involve themselves in any of the pending litigation. *Id.*

The Pragars and Wagner contend this finding of fact is erroneous because they were under no obligation to hire an attorney. Again, the trial court's finding only states that the Pragars and Wagner did not hire an attorney prior to May 8, 1992. They have not shown this finding to be clearly erroneous, as it is supported by the evidence of record.

### C. *Finding of Fact No. 24*

Finding of fact No. 24 provides:

The testimony of all Pragars and Wagner established that they were all good friends and communicated extensively with Bob Davidson, the realtor who prepared the real estate contracts for them. The Pragars looked to Davidson to provide them information and keep them informed about the status of the real estate. Bob Davidson was a knowledgeable realtor and was aware of the legal matters going on with the Leona Fox Farm. However, except for his conduct in soliciting and/or preparing the written expression of interest in closing on the Pragar and Wagner contracts, he took no steps to involve himself in any legal proceedings on behalf of the Pragars or Wagner.

*Id.* at 639.

The Pragars and Wagner contend this finding is erroneous because Davidson's contact with them was in his role as the agent of the Trust and thus his acts should have been construed to be acts of the Trust. They do not argue that the court's finding is factually incorrect or untrue. Rather, they have merely urged us to adopt a particular legal interpretation of the trial court's finding. This we will not do.

### D. *Finding of Fact No. 25*

Finding of fact No. 25 states:

In September 1993, the American State Bank as Trustee sought permission to sell the Leona Fox Farm. The attorney for American State Bank provided the Pragars and Wagner with a notice of a hearing which occurred in late September 1993. It was only at that time that the Pragars and Wagner engaged an attorney, Harvey M. Greene, to represent their interests and to object to the sale of the real estate.

*Id.*

The Pragars and Wagner argue that this finding ignores the fact that they did not have standing to participate in litigation concerning the Fox farm. However, the finding only states that the Pragars and Wagner did not employ an attorney to represent their interests and to object to the sale of the Fox farm until September of 1993. The court's finding makes no mention of whether the Pragars and Wagner had standing to participate in earlier actions. Again, the Pragars and Wagner are asking us to impose a particular legal interpretation upon the trial court's finding, which we will not do.

The evidence of record adequately supports the trial court's findings of fact. The Pragars and Wagner have not shown the trial court's findings are clearly erroneous.

### 3. *Laches*

The Pragars and Wagner also contend the trial court erred by finding their claim for specific performance was barred by the doctrine of laches. Laches consists of three elements: 1) inexcusable delay in asserting a known right; 2) an implied waiver arising from knowing acquiescence in existing conditions; and 3) circumstances resulting in prejudice to the adverse party. *Shafer v. Lambie*, 667 N.E.2d 226, 231 (Ind.Ct.App.1996).

Our supreme court has stated:

One having a technical claim on property and who is in possession of all the facts concerning such claim cannot sit idly by and permit another, who believes himself to be the owner of such property, to carry the burden of the property

while the owner of the claim by the passage of time makes sure that the property is worth carrying. An owner of a claim so doing is guilty of laches and a court of equity will not then permit him to assert such claim to the injury of the other party.

*Grantham Realty Corp. v. Bowers,* 215 Ind. 672, 685–86, 22 N.E.2d 832, 838–39 (1939).

Other jurisdictions have held that a delay which causes an increase in the value of property can constitute laches. *See Filler v. Richland County,* 247 Mont. 285, 806 P.2d 537, 540 (1991) ("In determining whether laches shall bar a particular claim, it is proper to consider ... whether the property involved has increased in value...."); *Schroeder v. Schlueter,* 85 Ill. App.3d 574, 41 Ill.Dec. 12, 407 N.E.2d 204, 206 (1980) ("[A] marked appreciation or depreciation in the value of ... property ... is evidence of injury or prejudice justifying the invocation of laches."); *Gaglione v. Cardi,* 120 R.I. 534, 388 A.2d 361, 364–65 (1978) ("[T]he plaintiff's unexplained ... delay in bringing this suit, coupled with the dramatic rise in the value of the parcel, makes this case a proper one for invoking the doctrine of laches.").

In the instant case, the Pragars and Wagner were aware of the legal problems surrounding the Fox farm. Rather than intervening in the Anna Fox litigation, they chose to sit on the sidelines while Leona's heirs fought court battles over ownership of the land and while Smith made improvements to the farm. Because the land has significantly increased in value, the sellers (the Bank and, by extension, Leona's heirs) would be prejudiced under the purchase agreements. Thus, the trial court did not err in applying the doctrine of laches to this case.

## CONCLUSION

The trial court did not abuse its discretion when it ruled that the Pragars' and Wagner's claims for specific performance of the purchase agreements for the Fox

land were barred by laches and other principles of equity. The trial court's judgment was supported with adequate findings of fact and conclusions of law.

Affirmed.

SULLIVAN, J., and RILEY, J., concur.