**Deborah K. BURK, David Rody, Bowman Aviation, Inc., and Aviation Warehousing Services, LLC, Appellants–Defendants and Cross–Appellees,**

v.

**HERITAGE FOOD SERVICE EQUIPMENT, INC. d/b/a Tri–State Business Services, Appellee–Plaintiff and Cross–Appellant.**

No. 02A05–9912–CV–557.

Court of Appeals of Indiana.

Oct. 24, 2000.

Robert T. Keen, Jr., Heidi K. Ellison, Miller Carson Boxberger & Murphy LLP, Fort Wayne, Indiana, Attorneys for Appellants.

Michael T. Yates, Moss Harris & Yates, Fort Wayne, Indiana, Attorney for Appellee.

## OPINION

BAKER, Judge

For the first time we address, under the Indiana Blacklisting statute, a former employee's claim against an employer who unsuccessfully sought to enforce a noncompetition agreement. Further, no Indiana court has addressed any claim under the Blacklisting statute since our supreme court in 1904. This opinion examines, among other things, the statute's protective reach regarding both litigant standing and redressable harm. Moreover, we are called upon to revisit the complexities of

restrictive covenants in employment agreements.

Appellants-defendants and cross-appellees Deborah K. Burk, David Rody and Bowman Aviation, Inc. and Aviation Warehousing Services, LLC (collectively referred to as Bowman) appeal the trial court's judgment concerning: a noncompetition agreement, an injunction, a tortious interference claim, Blacklisting claims, and an award of attorney fees to appellee-plaintiff and cross-appellant Tri–State Business Services (Tri–State). We consolidate the eleven issues that Bowman raises on appeal and restate them as whether the trial court erred by: 1) holding certain portions of a noncompetition agreement enforceable; 2) enjoining Rody from, *inter alia,* working for Bowman Aviation or working with Tri–State's existing customers for fourteen months *and* enjoining Bowman Aviation from providing services to Tri–State's existing customers for the same period; 3) denying Rody's and Burk's Blacklisting counterclaims; 4) finding that Bowman Aviation committed tortious interference; and 5) awarding attorney fees to Tri–State and denying Burk and Rody attorney fees. Tri–State also brings a cross-appeal challenging the award of attorney fees. Specifically, Tri–State contends that the court erred in: 1) denying attorney fees against Bowman Aviation and 2) awarding Tri–State only $11,000 in attorney fees.

## FACTS

The facts most favorable to the judgment indicate that Burk was employed by Tri–State, a data storage business, from August 30, 1993, to December 31, 1997. As a condition of her employment, Burk signed a noncompetition agreement and a confidentiality agreement. The noncompetition agreement provided in relevant part:

2. *Covenants Against Unfair Competition and Disclosure of Confidential Information.*

a) Employee agrees that during the term of employment, and for a period of two (2) years following the termination of Employment for whatever reason by any party thereto, Employee will not, directly or indirectly, do any of the following:

i) Own, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated as consultant, independent contractor or otherwise with any corporation, partnership, proprietorship, firm, association or other business entity which competes with, or otherwise engages in any business of the Corporation, as presently conducted in the States [sic] of Indiana (Territory" [sic] );

ii) Induce, solicit or acquire any current or past customers of the Corporation in the territory where the Corporation has or is currently conducting business as of the date of the execution of this Agreement for the purpose of engaging or soliciting sales, selling or competing with the Corporation in its business;

iii) Induce any person who is currently an employee of the Corporation to terminate his or her employment relationship with the Corporation;

iv) Employ or assist in employing, or otherwise associate as an active participant in business with any person who has been employed by the Corporation and is now employed by Corporation; and

v) Disclose, divulge, discuss, copy or otherwise use or suffer to be used in any manner in competition with, or contrary to the interests of the Corporation, the marketing plans or strategies, inventions, ideas, discoveries, product research or engineering data, if any, or other trade secrets, pertaining to the business of the Corporation, it being acknowledged by Employee that all such

information regarding such business of the Corporation compiled or obtained by, or furnished to, Employee while he shall have been employed by or associated with the Corporation is confidential information concerning the business of the Corporation which is now the exclusive property of the Corporation.

R. at 24–25. The Confidentiality Agreement provided in relevant part:

THE UNDERSIGNED ALSO AGREES THAT ALL FILES, FORMS, COMPUTER FORMS, PROCEDURES TRAINING MATERIAL AND CUSTOMER INFORMATION IS OF A PROPRIETARY NATURE AND SHALL REMAIN THE SOLE PROPERTY OF DRAKE. THE UNDERSIGNED ACKNOWLEDGES THAT ALL SUCH INFORMATION IS OF A PROPRIETARY NATURE AND AGREES TO KEEP ALL SUCH INFORMATION CONFIDENTIAL, AND RETURN TO DRAKE SUCH INFORMATION WHEN APPROPRIATE. THE UNDERSIGNED FURTHER AGREES NOT TO DISCLOSE, USE OR ANY WAY [sic] BENEFIT FROM SUCH INFORMATION. IN THE EVENT THAT THE UNDERSIGNED BREACHES THIS AGREEMENT, DRAKE SHALL BE ENTITLED TO ENJOIN UNDERSIGNED FROM FURTHER DISCLOSURE, INCLUDING DAMAGES AND REASONABLE ATTORNEY FEES.

R. at 28.

Burk worked as a clerical employee, earning roughly $5.00 to $8.00 an hour during the span of her employment. Burk's duties at Tri–State included scanning paper documents into a computer by feeding pages into a scanning machine. She did not have access to or knowledge of Tri–State's customer pricing information.

Experiencing job dissatisfaction, Burk responded to several want ads appearing in newspapers. When she responded to an officer manager job listed in a local news-paper, she did not know the identity of the company running the ad, which turned out to be Bowman Aviation. After being offered the position as Bowman Aviation's office manager, she resigned her job with Tri–State. Burk, however, did not copy, take, or memorize any of Tri–State's customer scanning information before assuming employment with Bowman Aviation. Moreover, Burk's new duties varied considerably from her duties at Tri–State, in that at Bowman Aviation she oversaw the scanning department, coordinated OSHA requirements, and was the first report person for accidents.

Rody, meanwhile, was employed as a salesman with Tri–State from June 18, 1996, until May 7, 1997. As a condition of his employment, he signed a noncompetition agreement and a confidentiality agreement that contained identical provisions as those set forth above. During the course of his employment, Rody had significant contact with Tri–State's past, current, and prospective customers. His duties included marketing and selling data storage services to businesses. Thus, Rody had access to current and prospective customer lists. In preparing to meet his employment duties, Rody spent considerable time being trained in Tri–State's marketing methods.

However, a Tri–State executive felt that Rody "wasn't living up to his expectations as a salesman" and that the data storage business "wasn't quite for him." R. at 746. When Rody was terminated from Tri–State on May 7, 1997, he returned all sales information that he had prepared or maintained. He did not take, copy, or memorize any Tri–State files or customer information.

Several months later, Bowman Aviation hired Rody as its national sales manager. In this capacity, Rody was in charge of sales for all of Bowman Aviation's ventures, including aircraft charter services, courier services, warehousing, and data storage. R. at 746–47. The evidence indi-

cates that, when Bowman Aviation hired Rody, it only offered paper warehouse storage and did not offer data storage or scanning services in competition with Tri–State.

Later, upon the suggestions of Doug Horner, president of one of its customers, Bowman Aviation entered the electronic data storage market. Bowman Aviation assigned to Rody the responsibility of developing and selling its electronic record storage services. As part of its business expansion, Bowman Aviation ordered scanning equipment and developed a web-based retrieval technology which was a technology more advanced than Tri–State's CD–Rom storage system. The trial court found that Bowman Aviation became Tri–State's competitor after it became involved in the electronic data storage market.

The trial court also found that Bowman Aviation knew "at all pertinent times" that Tri–State's principal business was providing business records storage services. Bowman Aviation knew, in turn, that an integral part of Tri–State's storage business was converting paper records to digital images capable of storage, indexing, and retrieval by computer. Moreover, the record indicates that Tri–State notified Burk, Rody, and Bowman Aviation of the existence of the Non–Competition and Confidentiality Agreements on February 10, 1998. Tri–State objected to Bowman Aviation's employment of Burk and Rody in capacities Tri–State believed to be competitive with its own business. Tri–State later sent Bowman Aviation's president, Edward Nix, a letter officially informing Bowman Aviation of the agreements and a potential tortious interference claim against the company. R. at 325. Despite this formal notification, Bowman Aviation continued to employ Burk and Rody in the same capacities.

Much of the dispute focused on Dana Corp.-Traffic Div. (Dana Corp.), a prospective client of Tri–State while Rody was still employed with Tri–State. Although Tri–State had not yet secured Dana Corp. as a customer during Rody's employ, Rody did have some contact with Dana Corp. on behalf of Tri–State before his job termination. Dana Corp. became Tri–State's customer for electronic storage services *after* Rody's termination and remained Tri–State's customer for over a year. Thereafter in spring 1998, Dana Corp. requested from Bowman Aviation information about electronic storage along with a price quote. Dana Corp. became a customer of Bowman in May or June 1998.

Tri–State brought suit against Burk, Rody, and Bowman Aviation to enforce the noncompetition agreement and to recover damages from, among other things, the agreement's purported breach. After a bench trial, on November 19, 1999, the trial court entered Findings of Fact, Conclusions of Law and Judgment pursuant to a party request. As part of the trial court's judgment, it ordered Tri–State to file a Verified Statement identifying those who were current customers during Rody's employ with Tri–State. In turn, both Rody and Bowman Aviation would be enjoined from providing data storage services to these customers for fourteen months. Burk, Rody, and Bowman now appeal while Tri–State cross-appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

We initially observe that Ind. Trial Rule 52(A) provides that "[o]n appeal of claims tried by the court without a jury ... the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." This court engages in a two-tiered standard of review when applying this standard. *Wagner v. Estate of Fox*, 717 N.E.2d 195, 200 (Ind.Ct.App.1999). First, we consider whether the evidence supports the findings, construing the findings liberally in support of the judgment. *Id.*

Findings are clearly erroneous only when a review of the record leaves us firmly convinced that a mistake has been made. *Id.* Next, we determine whether the findings support the judgment. A judgment is clearly erroneous when the findings of fact and conclusions thereon do not support it. *Id.* In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.*

We further note that the determination of the reasonableness of a covenant is a question of law for the courts. *Slisz v. Munzenreider Corp.*, 411 N.E.2d 700, 706 (Ind.Ct.App.1980). We review *de novo* all questions of law presented on appeal. *Serletic v. Noel,* 700 N.E.2d 1159, 1162 (Ind.Ct.App.1998).

## II. Enforceability of the Covenant Not To Compete

### A. General Noncompetition Clause

Bowman first challenges the trial court's enforcement of the general noncompetition clause of the covenant. Specifically, Bowman argues that the trial court's interpretation of paragraph 2(a)(i) of the covenant, in which the court narrowly interpreted the facially overbroad clause, was not permitted under Indiana law.

We begin our analysis by observing that noncompetition agreements or covenants not to compete are in restraint of trade and are not favored by the law. *Harvest Ins. Agency v. Inter–Ocean Ins. Co.,* 492 N.E.2d 686, 688 (Ind.1986); *Donahue v. Permacel Tape. Corp.,* 234 Ind. 398, 404, 127 N.E.2d 235, 237 (1955). Noncompetition agreements are strictly construed against the employer and are enforced only if reasonable. *Harvest,* 492 N.E.2d at 688. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. *Licocci v. Cardinal Assocs., Inc.,* 445 N.E.2d 556, 561 (Ind. 1983).

In determining the reasonableness of the covenant, we examine at the outset whether the employer has asserted a legitimate interest that may be protected by a covenant. *Id.* If the employer has asserted a legitimate, protectible interest, then we determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. *Id.* The employer bears the burden of showing that the covenant is reasonable and necessary in light of the circumstances. *Hahn v. Drees, Perugini & Co.,* 581 N.E.2d 457, 459 (Ind.Ct. App.1991). The employer must demonstrate, in other words, that "the former employee has gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a noncompetition covenant." *Slisz,* 411 N.E.2d at 705.

If a court finds that portions of the covenant are unreasonable, it "may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they have not made." *Smart Corp. v. Grider,* 650 N.E.2d 80, 83 (Ind.Ct.App.1995). However, if a covenant is clearly divisible into parts, and some parts are reasonable while others are unreasonable, a court may enforce the reasonable portions only. *Hahn,* 581 N.E.2d at 462. Under this process, known as "blue-penciling," a court strikes unreasonable provisions from the covenant. When applying the blue pencil, a court must not add terms that were not originally part of the agreement. *Smart Corp.,* 650 N.E.2d at 83–84. Rather, "unreasonable restraints are rendered reasonable by scratching out any offensive clauses to give effect to the parties intentions." *Id.* at 84; *see also Covenants Not To Compete: A State–by–State Survey* 820 (BNA Books, 2d ed. Supp.1999) (" 'Thus under Indiana law, as distinct from Michigan law for example, if an employer is trying to enforce an overly broad noncompetition

agreement, the court may not try to fix the problem simply by writing an injunction the court thinks would be reasonable.'") (quoting *Bridgestone/Firestone, Inc. v. Lockhart,* 5 F.Supp.2d 667, 683 (S.D.Ind. 1998)).

■ In the instant case, Bowman contends that paragraph 2(a)(i), among other portions of the noncompetition agreement, is unreasonably broad. That portion of the agreement reads:

(a) Employee will not ... do any of the following:

(i) Own, manage, control or participate in the ownership, management or control of, or *be employed* or engaged by or otherwise affiliated or associated as consultant, independent contractor or otherwise *with any corporation,* partnership, proprietorship, firm, association or other business entity *which competes with, or otherwise engages in any business of the Corporation,* as presently conducted in the States [sic] of Indiana (Territory" [sic] ).

R. at 24 (emphasis supplied). In light of such language, Bowman asserts that the covenant is overbroad in that it effectively prohibits Rody from working for a competitor in any capacity.

■ A federal court in the Southern District of Indiana[1] examined a similar covenant that purported to bar a former employee from working for the employer's competitors in any capacity. *See Bridgestone/Firestone, Inc. v. Lockhart,* 5 F.Supp.2d 667 (S.D.Ind.1998). The relevant terms of the *Lockhart* covenant were that "[the employee] will not directly or indirectly own, manage, operate, control, be employed by or consult with any business entity which is in the same or similar business to that which is being conducted at Firestone." *Id.* at 683. Under those covenant terms, the court held that "the prohibition as drafted therefore extends far beyond the employer's legitimate inter-

ests and is thus not enforceable." *Id.* at 685. As in *Lockhart,* it is apparent that the agreement here prohibits Rody from working for Bowman Aviation, or any other Tri–State competitor, in any capacity.

The trial court, to the contrary, found that this provision was reasonable. R. at 756. However, as Bowman notes, the trial court impermissibly interpreted and applied this portion of the agreement. Appellants' brief at 17. The trial court concluded that Rody had breached paragraph 2(a)(i) by "becoming employed ... in a *competitive* capacity by Bowman." R. at 758 (emphasis supplied). Such a conclusion indicates that the trial court "created a reasonable restriction under the guise of interpretation." *See Smart Corp. v. Grider,* 650 N.E.2d 80, 83 (Ind.Ct.App.1995). In other words, the trial court added terms that were not originally part of the agreement, rather than merely striking offensive terms. *See id.* at 84. In light of our supreme court's directive that covenants are to be strictly construed against the employer, *Harvest Ins. Agency v. Inter–Ocean Ins. Co.,* 492 N.E.2d 686, 688 (Ind. 1986), we are compelled to conclude that paragraph 2(a)(i) of the covenant is unenforceable.

### B. Trade Secrets Clause

Bowman also challenges the trial court's enforcement of paragraph 2(a)(v), the trade secrets clause, of the noncompetition agreement. More specifically, Bowman contends that Tri–State failed to show a protectible interest in the information inasmuch as the trial court found certain customer information was generally available or readily ascertainable.

The relevant portion of paragraph 2(a)(v) read:

(a) Employee will not do any of the following:

. . . .

---

1. We note that, while federal court decisions interpreting Indiana law are persuasive authority, we are not bound by their interpreta-

tions. *See, e.g., General Motors Corp. v. Indianapolis Power & Light Co.,* 654 N.E.2d 752, 763 (Ind.Ct.App.1995).

(v) Disclose, divulge, discuss, copy or otherwise use or suffer to be used in any manner in competition with, or contrary to the interests of the Corporation, *the marketing plans or strategies,* inventions, ideas, discoveries, product research or engineering data, if any, *or other trade secrets, pertaining to the business of the Corporation,* it being acknowledged by Employee that *all such information regarding such business of the Corporation compiled or obtained by, or furnished to, Employee while he shall have been employed by or associated with the Corporation is confidential information* concerning the business of the Corporation which is now the exclusive property of the Corporation.

R. at 25 (emphasis supplied). The trial court found that Rody had breached the trade secrets clause of the agreement in "using marketing plans and strategies of Tri–State by offering services in competition with services by Tri–State." R. at 758.

We note that our courts will enforce a covenant to protect a "trade secret" as defined by the Indiana Uniform Trade Secrets Act (IUTSA). *See Xpert Automation Sys. v. Vibromatic Co.,* 569 N.E.2d 351, 354 (Ind.Ct.App.1991) (holding that plaintiff's customer list was not entitled to protection under the Act). A trade secret, as defined by IND.CODE § 24–2–3–2, is:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Thus, a protectible trade secret has four general characteristics: 1) information; 2) deriving independent economic value; 3) not generally known, or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use; and 4) the subject of efforts, reasonable under the circumstances to maintain it secrecy.

Bowman challenges the trial court's enforcement of paragraph 2(a)(v) by asserting, in part that: "Tri–State has no patents or secret formulas that qualify as a trade secret." Appellant's brief at 27. In addressing this contention, we note that IUTSA protects all information, *including* formulas or processes, that exhibits the four general characteristics set forth in the statute. The trial court found that Rody's sales and services on behalf of Bowman Aviation were based in part on "operational and customer information obtained by Rody during his employment by Tri–State." R. at 750. However, the trial court, while addressing the enforceability of the Confidentiality Agreement, later found that Tri–State "failed to carry its burden of proof that its procedures information and customer information were not generally known to and readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use." R. at 763. It was further concluded that Tri–State failed to show that the data storage market was not a readily identifiable discrete group of customers. R. at 764. Rather, the trial court found that names and locations of the customers were easily ascertainable from the telephone directory and publicly known. R. at 764.

We initially note that an apparent conflict in findings is of no avail to an appellant where at least one finding supports the trial court's judgment. *See Dowell v. Jolly,* 130 Ind.App. 280, 291, 159 N.E.2d 590, 595 (1959) (holding that con-

flict between finding that there was a failure of consideration for a conveyance and a finding that there was no consideration was immaterial where first finding was sufficient to support the judgment). Here the trial court found that Rody unfairly used Tri–State's marketing information and sales strategy in breach of the trade secrets clause. Tri–State's president testified that the cycle for training in marketing is a costly and extensive process. R. at 238. He also testified that he and Rody spent "a tremendous amount of time together going over sales calls and presentations and market areas and various types of businesses." R. at 273. We conclude that the evidence supports the trial court's findings and that the findings, despite their facially contradictory nature, support the judgment. We also note the evidence that each employee signed a confidentiality agreement and noncompetition agreement, which supports the statutory element of effort to maintain the secrecy of the information. R. at 236–37. In sum, the evidence and reasonable inferences therefrom support the trial court's findings and judgment that Rody violated the trade secrets portion of the noncompetition agreement.

### C. Nonsolicitation Clause

■ Bowman next argues that paragraph 2(a)(ii), the nonsolicitation clause, is also unenforceable. Specifically, Bowman contends that Tri–State failed to prove a breach of this provision and that the trial court erroneously enjoined Rody from soliciting certain Tri–State customers.

Paragraph 2(a)(ii) of the noncompetition agreement read:

(a) Employee will not ... do any of the following:

. . . .

(ii) Induce, solicit or acquire any current or past customers of the Corporation in the territory where the corporation has or is currently conducting business as of the date of the execution of this Agreement for the purpose of engaging or soliciting sales, selling or competing with the Corporation in its business. . . .

R. at 30.

The trial court found this paragraph overbroad and unenforceable as originally drafted. As a result, the trial court lifted the "blue pencil" and deleted the words "or past" from the first line of the paragraph and the words "engaging or soliciting in sales, selling or," from the fifth and sixth lines of the agreement. Thus, the edited version of the agreement reads:

(a) Employee will not ... do any of the following:

. . . .

(ii) Induce, solicit or acquire any current customers of the Corporation in the territory where the corporation has or is currently conducting business as of the date of the execution of this Agreement for the purpose competing with the Corporation in its business. . . .

R. at 758.

In *Seach v. Richards, Dieterle & Co.*, this court blue-penciled a provision barring a former employee from soliciting "past, present, and prospective" clients. 439 N.E.2d 208, 214 (Ind.Ct.App.1982). We enforced the acceptable portion, which restricted solicitation of present customers, by striking the modifiers "past" and "prospective." *Id.* As in *Seach*, we conclude that the trial court correctly deleted the words "or past" from the agreement here, thus rendering it enforceable.

Moreover, a plain interpretation of the original, unedited agreement, by reading the proscriptive list disjunctively, would prevent Rody from soliciting customers for the selling of products that do not compete with Tri–State's. For example, soliciting Tri–State's customers, even to sell them seed corn, would have violated the agreement's nonsolicitation clause. But Indiana courts are not permitted to render a covenant restriction reasonable under the guise

of interpretation. *See Smart Corp.*, 650 N.E.2d at 83. Therefore, the trial court, by applying the blue pencil, correctly narrowed the scope of the agreement's prohibition against "engaging or soliciting sales" or "selling" to Tri–State's customers.

That being said we now proceed to address the application of the nonsolicitation clause as well as the effects of our holding paragraph 2(a)(i) of the agreement unenforceable.

### III. Manner of Enforcement: Injunction

■ Bowman also contends that the trial court abused its discretion in entering its injunction against both Rody and Bowman Aviation. Specifically, Bowman argues that the covenants were unenforceable and that Tri–State failed to show that it would sustain irreparable harm. As a result, Bowman maintains that the injunctions may not stand.[2]

■ The grant or denial of an injunction lies within the trial court's sound discretion. The decision will not be overturned unless it was arbitrary or amounted to an abuse of discretion. *Cooper v. Calandro*, 581 N.E.2d 443, 445 (Ind.Ct.App. 1991). But because an injunction is an extraordinary equitable remedy, it should be granted only with caution. *Id.* Permanent injunctions are limited to prohibiting injurious interference with rights. *Soc. Servs. v. Hospitality House*, 704 N.E.2d 1050 (Ind.Ct.App.1998). Thus, injunctive relief "may and should be coextensive with the danger sought to be avoided by it." *Lawrence v. Cain*, 144 Ind.App. 210, 218, 245 N.E.2d 663, 667 (1969). In other words, the restraint imposed by the decree should not be more extensive than is rea-

sonably required to protect the interests of the party in whose favor it is granted. *Id.*

■ We also note that persons not party to a covenant may be enjoined from the same activities as a person who is a party to a covenant. *Norlund v. Faust*, 675 N.E.2d 1142, 1155 (Ind.Ct.App.1997). When there is evidence that a nonparty to a covenant aided or operated in concert with the covenantor to breach the covenant, the nonparty may be subject to an injunction enforcing the covenant. *Id.* at 1157.

In deciding to grant the injunction, the trial court found that Tri–State failed to prove "specific damages" from the violation of the noncompetition agreement. R. at 765. Rather, the trial court found that Tri–State had suffered, and would likely suffer in the future, damages in an unknown amount. R. at 765. The court further found that Tri–State had no adequate remedy at law regarding Rody and Bowman's actions and threatened actions of soliciting Tri–State customers. R. at 766. As a result, the trial court issued the following order:

> 2. For a period of 14 months ... David Rody, is enjoined from:
>
> a. working in any capacity related to the sale or delivery of business records storage service and/or data storage services or scanning conversion services in the state of Indiana; and
>
> b. providing business records storage services and/or data storage services or scanning conversion services to, or communicating directly or indirectly with any of the businesses ... who were current customers of [Tri–

**2.** Bowman also maintains that the trial court erred in ordering Tri–State to submit a post-judgment verified statement listing customers who were current customers during Rody's employ at Tri–State. We note that IND.CODE § 34–26–1–9 permits: "Upon the granting or continuing of an injunction, such terms and conditions may be imposed the party obtaining the injunction that are considered equitable." This list; as the trial court prop-

erly pointed out, clarified the injunction and apprised Bowman Aviation and Rody of the customers they are not allowed to solicit for the duration of the injunction. R. at 807. Moreover, Bowman had an opportunity to object to the names on the list at a hearing on January 11, 2000. Therefore, we find no abuse of discretion on the part of the trial court.

State] for such services at any time during the period from June 18, 1996 through May 7, 1997, for the purpose of selling storage services and/or data storage services or scanning conversion services to said businesses.

3. For a period of 14 months ... [Bowman Aviation is] enjoined from:

a. employing or continuing to employ ... David Rody in any capacity related to the sale or delivery of business records storage services and/ or data storage services or scanning conversion services in the state of Indiana; and

b. providing business records storage services and/or data storage services or scanning conversion services to, or communicating directly or indirectly with any of the businesses ... who were current customers of [Tri–State] for such services at any time during the period from June 18, 1996 through May 7, 1997, for the purpose of selling storage services and/or data storage services or scanning conversion services to said businesses.

R. at 769–70.

Because we have determined that paragraph 2(a)(i) of the covenant is overbroad and unenforceable inasmuch as it restricted Rody from working in any capacity for a Tri–State competitor, Tri–State is not entitled to the injunctive relief provided in paragraphs 2(a) and 3(a) of the trial court's judgment. In other words, the trial court's decree went beyond Tri–State's legitimate interests rather than being coextensive with those interests. *See Lawrence v. Cain,* 144 Ind.App. 210, 218, 245 N.E.2d 663, 667 (1969).

However, because the blue-penciled nonsolicitation clause is reasonable and enforceable, paragraphs 2(b) and 3(b) are coextensive with Tri–State's legitimate interests. Though the trial court found that Tri–State failed to prove damages as a result of a breach of the nonsolicitation clause, evidence was presented that Rody threatened to take away Tri–State's current customers on behalf of Bowman Aviation. R. at 750. Moreover, the trial court found that Rody and Bowman Aviation had solicited Tri–State's present customers for the sale of data storage services. R. at 750. The evidence also showed that Bowman began providing data storage services to Data Corp. R. at 751. Data Corp. was a prospective customer of Tri–State while Rody was employed there and became a Tri–State customer after Rody left Tri–State. R. at 751. In light of these findings, we see no abuse of discretion in enjoining Rody from soliciting those who were current customers of Tri–State during his employ. Moreover, as one who aided Rody in the breach of the nonsolicitation clause, Bowman Aviation is also subject to the injunctive relief provided for in paragraph 3(b) of the trial court's judgment. *See Norlund,* 675 N.E.2d at 1157.

### IV. Tortious Interference

We review the trial court's judgment, regarding Tri–State's claim of tortious interference, under the clear error standard set out above. To prevail on a claim of tortious interference, Tri–State had to prove: 1) the existence of a valid and enforceable contract, 2) Bowman's knowledge of the existence of the contract, 3) Bowman's intentional inducement of the breach of the contract, 4) absence of justification, and 5) damages resulting from Bowman's wrongful inducement of breach. *Biberstine v. N.Y. Blower Co.,* 625 N.E.2d 1308, 1317 (Ind.Ct.App.1993). The measure of damages for wrongfully inducing a breach of contract is compensation for the loss incurred. *Lee & Mayfield v. Lykowski House Moving Eng'rs, Inc.,* 489 N.E.2d 603, 610 (Ind.Ct.App.1986).

The court's finding on the tortious interference damage element read as follows:

Although Tri–State failed to prove any specific damages resulting from the conduct of Rody and Bowman in violation of the Non–Competition Agreement

through the dates of the trial, the evidence showed that Tri–State suffered, and will likely in the future suffer, damages in an unknown amount as a result of Bowman's wrongful inducement of Rody to breach his Non–Competition Agreement with Tri–State.

R. at 765–66.

We need not examine each element of the tort in light of the instant facts since the trial court found that Tri–State failed to prove specific damages from the breach of the covenant. R. at 765. Tri–State has not shown that it has incurred a loss. Without evidence of a compensable loss Tri–State has failed to prove damages, an essential element of tortious interference. Because the trial court's findings do not support the judgment against Bowman Aviation for tortious interference, we must reverse the judgment on this claim.

### V. Blacklisting Counterclaims

#### A. Burk's Counterclaim

■ Burk challenges the trial court's judgment in favor of Tri–State on her Blacklisting claim. Specifically, Burk contends that the trial court misinterpreted Ind.Code § 22–5–3–2 (the Blacklisting statute) to apply only to employees who are involuntarily discharged.

We review the trial court's judgment on the Blacklisting counterclaim under the clear error standard. Indiana's Blacklisting statute provides in pertinent part:

If any railway company ... or corporation in this state shall authorize, allow or permit any of its or their agents to black-list any discharged employees, or attempt by words or writing, or any other means whatever, to prevent such discharged employee, *or any employee who may have voluntarily left said company's service,* from obtaining employment with any other person, or company, said company shall be liable to such employee in such sum as will fully compensate him, to which may be added exemplary damages.

I.C. § 22–5–3–2 (emphasis supplied). We note that the plain text of the statute applies to both discharged employees and those who voluntarily leave employment. However, as our supreme court held in *Wabash Railroad Co. v. Young,* the statute now codified as I.C. § 22–5–3–2 does not apply to a former employee who voluntarily left employment. 162 Ind. 102, 103, 69 N.E. 1003, 1004–05 (1904). The supreme court reasoned that the original title of the Blacklisting statute, "An act for the protection of discharged employees and to prevent blacklisting" violated then-Article IV, § 19 of the Indiana Constitution. In 1904, that constitutional provision mandated:

An act of the legislature can embrace but one subject and matters properly connected therewith, *which subject must be expressed in the title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title.*

IND. CONST. art. IV, § 19 (amended 1960 and 1974) (emphasis supplied). Inasmuch as the title of the Act referred only to "discharged employees," the Act could not constitutionally embrace employees who voluntarily left employment. *Wabash R.R. Co.,* 69 N.E. at 1004–05. The court then held that the Act could not apply to the plaintiff, a former employee who voluntarily left employment. *Id.* at 1005.

We acknowledge the federal district court's treatment of the Blacklisting statute regarding employees who voluntarily leave employment. *See Lockhart,* 5 F.Supp.2d at 685. Subsequent to the court's issuance of *Lockhart* but prior to the opinion's publication in the *Federal Supplement, Wabash Railroad Co. v. Young* came to the attention of the federal district court. The court noted that the "rigorous application of the 'one subject' requirement stands in sharp contrast to the Indiana court's approach to similar issues in many cases before and after

*Young." Lockhart,* 5 F.Supp.2d at 687 n. 13.

As the *Lockhart* court observed, our supreme court has "upheld legislation against 'one subject' challenges provided there is 'any reasonable basis' for linking the subjects." *Id.; see, e.g., Bayh v. Ind. State Bldg. & Constr. Trades Council,* 674 N.E.2d 176, 179 (Ind.1996) ("The single subject provisions of the Constitution and the enrolled act rule are designed to promote fair practice in legislating without much judicial intervention."); *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 531, 418 N.E.2d 207, 214 (1981) ("[I]n considering the validity of an act under [IND. CONST. art. IV, § 19], a very liberal interpretation is to be applied, with all doubts resolved in favor of the legislation's validity.... 'And if, from the standpoint of legislative treatment, there is any reasonable basis for the grouping together in one 'act' of various matters, this court cannot say that such matters constitute more than one subject.'" (quoting *State ex rel. Test v. Steinwedel,* 203 Ind. 457, 467–68, 180 N.E. 865, 868 (1932))); *Ule v. State,* 208 Ind. 255, 265, 194 N.E. 140, 143 (1935) (upholding one act as constitutional which combined provisions concerning motor vehicle regulation, chauffeur licensing, garagemen's leins on motor vehicles, and hit-and-run drivers).

We also note that, since the 1904 *Wabash Railroad Co.* decision, Article IV, § 19 has been amended to read: "An act, except an act for codification, revision or rearrangement of laws, shall be confined to one subject and matters properly connected therewith." Thus, the constitutional provision, as of November 5, 1974, no longer requires that the title of the act express the subject of the act. But despite this change in the constitutional provision as well as our supreme court's subsequent, less-restrictive interpretation of Article IV, § 19, we are still obliged to follow the precedent established by our supreme court. *See, e.g., Red Arrow Ventures, Ltd. v. Miller,* 692 N.E.2d 939, 946 (Ind.Ct.App.

1998). It is our supreme court's prerogative to modify its holding in *Wabash Railroad Co.* in light of the amended constitutional provision. Therefore, inasmuch as Burk voluntarily left Tri–State's employment, she may not maintain an action under the Blacklisting statute.

We are not persuaded that, even if Burk had standing under the Blacklisting statute, her counterclaim could survive on the merits. The plain text of the statute reads in part: "If any ... corporation in this state shall ... attempt by words or writing, or any other means whatever, to prevent such discharged employee, or any employee who may have voluntarily left said company's service, from *obtaining* employment...." I.C. § 22–5–3–2 (emphasis supplied). Burk has made no showing that Tri–State attempted to prevent her from obtaining employment at Bowman. Rather, Tri–State has attempted to enforce a covenant prohibiting activities that Burk might have engaged in as a Bowman employee.

### B. Rody's Counterclaim

Rody also challenges the trial court's judgment denying his counterclaim against Tri–State. Specifically, Rody maintains that a reversal of the trial court on the enforceability of the noncompetition agreement would require reversal on his unsuccessful Blacklisting counterclaim against Tri–State.

Though as a discharged employee Rody has standing under the Blacklisting statute, his counterclaim against Tri–State similarly fails. First, he has made no showing that Tri–State attempted to prevent him from obtaining employment. To the contrary, the president of Tri–State helped Rody obtain employment with another business, Heritage Electronics, when he decided to terminate Rody's employment at Tri–State. R. at 299. Second, Tri–State has successfully enforced the nonsolicitation clause of its noncompetition agreement with Rody. Successfully litigating a claim against a former employee

does not fall within the prohibitions of the Blacklisting statute. Therefore, Rody's counterclaim against Tri–State fails.

## VI. Attorney Fees

### A. Bowman's Contentions

Each party challenges the trial court's award of attorney fees. Specifically Bowman contends that the trial court erred in its: 1) denial of attorney fees in favor of Burk and Rody pursuant to their Blacklisting counterclaims and 2) grant of attorney fees against Rody in favor of Tri–State for breach of the noncompetition agreement. Generally, each party to litigation is required to pay his own attorney fees. *Shumate v. Lycan,* 675 N.E.2d 749, 754 (Ind.Ct.App.1997). Thus, attorneys fees are not recoverable without an express contractual obligation or specific statutory authority stipulating such fees are recoverable. *Id.* When attorney fees are recoverable, the amount of an award is left to the sound discretion of the trial court. *Castlewood Property Owners Ass'n, Inc. v. Trepton,* 720 N.E.2d 10, 14, (Ind.Ct.App.1999).

Burk's assertion of right to attorney fees rests on the Blacklisting statute, providing that an employer "shall be liable to [a former employee] in such sum as will fully compensate him, to which may be added exemplary damages" for violation of the Act. Because Burk has no standing to prosecute a claim under the statute, her claim for attorney fees must fail. In any event, even if Burk had standing under the Act, her claim would not succeed on the merits, and thus she would not be entitled to attorney fees. Likewise, inasmuch as Tri–State has successfully litigated a rightful claim against Rody, he is not entitled to attorney fees under the Blacklisting statute.

Next, Bowman contends that Rody is not liable for Tri–State's attorney fees because the noncompetition agreement is unenforceable. The agreement provided that, in the event of Rody's breach, he would be liable for reasonable attorney fees to enforce the agreement. R. at 30. Bowman concedes that "Rody is bound to pay attorney fees incurred by Tri–State if its action is upheld against him." Appellants' reply brief at 12. Since the nonsolicitation clause was appropriately enforced by injunction, Tri–State is entitled to attorney fees from Rody in bringing this action.

### B. Tri–State's Contentions

Tri–State also challenges the trial court's award of attorney fees. Specifically, Tri–State contends that the trial court erred in: 1) denying it attorney fees against Bowman Aviation and 2) awarding only $11,000 against Rody.

Inasmuch as we have determined that Tri–State failed to prove that Bowman Aviation committed tortious interference, Tri–State has no statutory or contractual basis upon which to assert a claim for attorney fees against Bowman Aviation. The trial court had also concluded that Tri–State had no statutory or contractual authority to succeed on a claim of attorney fees against Bowman Aviation. Therefore, we affirm the trial court's judgment in this respect.

We note that Tri–State brought three separate claims against Burk, Bowman Aviation, and Rody. Each claim required proof of separate facts, witnesses, and discovery. Though Tri–State requested attorney fees in excess of $27,000, the trial court found that $11,000 charged only to Rody was a reasonable sum given the number of defendants and claims. We cannot say that the trial court's assessment of the amount of the award was an abuse of discretion. Therefore, we affirm the trial court's judgment with respect to the amount of attorney fees awarded against Rody.

## CONCLUSION

In sum, we have determined that: 1) only paragraph 2(a)(v) and the blue-pen-

ciled paragraph 2(a)(ii) of the covenant is enforceable against Rody and Bowman Aviation, 2) only paragraphs 2(b) and 3(b) of the trial court's injunction are permissible, 3) Tri–State failed to prove its tortious interference claim, 4) both Burk and Rody failed to prove their Blacklisting claims, 5) neither Burk nor Rody were entitled to an award of attorney fees against Tri–State, 6) Tri–State was not entitled to an award of attorney fees against Bowman Aviation, and 7) the trial court did not abuse its discretion in awarding $11,000 in attorney fees to Tri–State against Rody.

Judgment affirmed in part and reversed in part.

SHARPNACK, C.J., and VAIDIK, J., concur.