**Michael DICEN, Appellant,**

v.

**NEW SESCO, INC., Appellee.**

No. 55A01–0305–CV–173.

Court of Appeals of Indiana.

April 22, 2004.

Terrence J. Sorg, Brooks Koch & Sorg, Indianapolis, IN, Attorney for Appellant.

Thomas B. Blackwell, Mark R. Galliher, Hopper & Galliher, P.C., Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Appellee–Plaintiff New Sesco, Inc. brought suit against Appellee–Defendant Michael Dicen, alleging that he was in violation of non-competition clauses contained in a purchase agreement and an employee agreement. Dicen brings this interlocutory appeal following the trial court's grant of a preliminary injunction prohibiting him from engaging in certain activities in competition with New Sesco. Dicen presents several issues for our appellate review, which we restate as:

I. Whether the preliminary injunction was improperly entered because the non-competition covenants are unreasonable and unenforceable as a matter of law and because the trial court erred in finding that certain information was protectable and confidential;

II. Whether the trial court abused its discretion by excluding certain evidence which Dicen proffered regarding his affirmative defense of unclean hands;

III. Whether the trial court improperly used parol evidence in interpreting the covenants not to compete; and

IV. Whether the trial court improperly set the injunction bond at $10,000.

We affirm in part, reverse in part, and remand with instructions.

The record reveals that Dicen worked for the Indiana Department of Environmental Management ("IDEM") in the Office of Air Quality from 1989 to 1996. In 1996, Dicen, along with fellow IDEM employees David Hughes and David Valinetz, left IDEM to form their own company incorporated under the name Supreme Environmental Service Co. ("Sesco"). Sesco provided environmental consulting for air compliance testing and remediation. Dicen's primary responsibilities included managing and promoting environmental testing and remediation services for companies with smoke stacks regulated by

IDEM. Between 1996 and 1999, Dicen had grown Sesco's stack testing division from approximately $180,000 per year to approximately $300,000 per year. In 1998, Dicen, Hughes, and Valinetz organized two other companies with plans to purchase environmentally contaminated sites, remediate them, and sell the sites for a profit. These companies, along with Sesco, formed what was referred to as the "Sesco Group" companies.

As Sesco began to look for investors to assist it in purchasing contaminated sites, a group of investors decided that they would like to purchase the assets of the Sesco Group companies. Eventually, these investors incorporated New Sesco, Inc. and purchased the assets of the Sesco Group companies. The purchase was memorialized in an Asset Purchase Agreement ("Purchase Agreement"), whereby New Sesco paid a total purchase price of $750,000.[1] Dicen received between $280,000 and $300,000 from the sale of his share of the Sesco Group companies.[2] Dicen signed the Purchase Agreement on July 12, 1999. Also on July 12, 1999, Dicen signed a three-year Employment Agreement with New Sesco.

Dicen worked for New Sesco in the same capacity as he had for Sesco, i.e., primarily relating to air permit compliance and stack testing. Dicen continued to work for New Sesco until July 2002, when he advised New Sesco that he was resigning effective July 12, 2002.[3] Dicen had been planning to leave New Sesco and compete with it and had even sought legal counsel as to the effect of the non-competition clauses in the Purchase and Employment Agreements. Before Dicen's final day of employment, Dicen and Jim Bryan, New Sesco's Chief Operating Officer, met at least three times to discuss various subjects including the non-competition provisions of the Purchase and Employment Agreements. Mr. Bryan asked Dicen to prepare a "customer list," and on his last day of employment, Dicen gave Mr. Bryan a computer diskette listing various contacts. According to Dicen, this diskette was a compilation of the information contained in his Rolodex. Mr. Bryan testified that he informed Dicen that New Sesco did not want Dicen to solicit any past or current customers, or any companies to whom New Sesco had made proposals.

On July 15, 2002, Dicen incorporated Air Analysis, Inc., a company which provides air stack testing services, the same function Dicen performed for New Sesco. Di-

---

**1.** In the statement of facts in his appellant's brief, Dicen explains at length the circumstances surrounding his signing of the Purchase Agreement, claiming: that he was told immediately prior to signing that Valinetz would own an interest in New Sesco, that the Purchase Agreement was first shown to him within days of a scheduled closing on the sale of certain property in North Carolina, that he did not have a fair and reasonable opportunity to obtain counsel to review the Purchase Agreement, and that he signed "under protest and under economic duress." Appellant's Brief at 5. However, in his statement of the issues, the summary of the argument, and the argument sections of his brief, Dicen does not develop an argument that the Purchase Agreement was not validly executed. Neither will we develop this argument for him. More-

over, Dicen testified that he signed the provisions of his own free will and, although admittedly free to do so, chose not to hire a lawyer at the time he signed.

**2.** Dicen erroneously claims that the "undisputed evidence" was that he received only $163,000 for the sale of his interest in the Sesco Group companies. Appellant's Brief at 6. However, when asked at the preliminary injunction hearing if he received between $280,000 and $300,000 for his interest, Dicen responded, "Yes." Transcript at 11.

**3.** Friday July 12, 2002 was the last weekday before the expiration of Dicen's Employment Agreement on July 13, 2002.

cen is the sole owner of Air Analysis. On January 16, 2003, New Sesco filed suit against Dicen seeking a preliminary injunction. The complaint alleged that Dicen had: (1) breached the non-competition covenants contained in the Purchase and Employment Agreements; (2) tortiously converted New Sesco's trade secrets and proprietary information; (3) violated the Indiana Uniform Trade Secrets Act; and (4) breached a fiduciary duty owed to New Sesco. Dicen filed his answer on March 10, 2003, denying the relevant portions of the complaint and setting forth various affirmative defenses. Dicen also asserted counterclaims against New Sesco alleging abuse of process and "blacklisting."

The trial court held a preliminary injunction hearing on March 26, April 8, and April 9, 2003. At the preliminary injunction hearing, Dicen attempted to introduce evidence supporting his claim that the reasons for his resignation included false statements by Valinetz to Dicen, IDEM, and New Sesco customers, and New Sesco's alleged acquiescence in the unlawful removal of asbestos from the building in which New Sesco's offices were located. The trial court sustained New Sesco's objections to this evidence. On April 16, 2003, both parties filed their proposed findings and conclusions. On April 21, 2003, the trial court entered an order granting a preliminary injunction and adopting New Sesco's proposed findings and conclusions. The security bond for the issuance of the injunction was set at $10,000. Dicen filed this interlocutory appeal as of right on May 8, 2003. *See* Ind. Appellate Rule 14(A)(5).

## I

*Propriety of Preliminary Injunction*

██ Although he goes about it in several different ways, Dicen's principal claim upon appeal is that the trial court erred in entering the preliminary injunction. The decision of whether to grant a preliminary injunction rests within the discretion of the trial court, and our review is limited to the determination of whether the trial court clearly abused that discretion. *Norlund v. Faust,* 675 N.E.2d 1142, 1149 (Ind.Ct.App. 1997). In determining whether to grant a preliminary injunction, the trial court must make special findings of fact and conclusions of law. Ind. Trial Rule 52(A); *Norlund,* 675 N.E.2d at 1149. As is the case whenever such special findings and conclusions are made, it is our duty to determine whether the evidence supports the trial court's findings and whether the findings support the judgment. *Norlund,* 675 N.E.2d at 1149. A judgment will be reversed only when clearly erroneous, i.e., when it is unsupported by the findings and the conclusions. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences drawn from the evidence to support them. *Id.* We construe the findings liberally in favor of the judgment and consider only the evidence favorable to the judgment. *Id.* Here, the trial court simply adopted New Sesco's proposed findings and conclusions. Although it is not prohibited, this practice weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court. *Cook v. Whitsell–Sherman,* 796 N.E.2d 271, 273 n. 1 (Ind.2003); *Prowell v. State,* 741 N.E.2d 704, 708–09 (Ind.2001).

██ Upon review of a decision regarding a preliminary injunction, the trial court's discretion is measured by several factors. These factors include: (1) whether the party seeking the injunction has an adequate remedy at law; (2) whether granting the injunction would disserve the public interest; (3) whether the party seeking the injunction has established a reasonable likelihood of success at trial;

and (4) whether the injury to the party seeking the injunction outweighs the harm to the party who would be enjoined. *Norlund,* 675 N.E.2d at 1149. The party seeking the preliminary injunction bears the burden of establishing a prima facie case at the preliminary injunction hearing. *Id.* The complaining party is not required to show that he is entitled to relief as a matter of law, nor is he required to prove and plead a case which would entitle him to relief upon the merits. *Id.* We must therefore determine whether the likelihood of success is so improbable as to render the trial court's determination erroneous as a matter of law. *Id.* Dicen challenges the issuance of the preliminary injunction by claiming that New Sesco admitted that it had an adequate legal remedy and that New Sesco failed to demonstrate a reasonable likelihood of success at trial.

### A. Adequate Remedy at Law

 In attacking the preliminary injunction, Dicen claims that New Sesco admitted that it had an adequate remedy at law. It has been held that when a covenant not to compete of this nature is breached, it follows that the employer will suffer harm. *Norlund,* 675 N.E.2d at 1149–50. It would be pure speculation to place a dollar amount on such damages, and an injunction against the prohibited behavior is the most efficient way to lift the burden of that harm from the shoulders of the employer who contracted so as not to suffer such harm. *Id.* Here, Mr. Bryan did testify that he would be able to calculate New Sesco's damages resulting from Dicen's competition with certain customers with whom New Sesco had a relationship. However, upon questioning by New Sesco's counsel, Mr. Bryan testified that based upon the ongoing nature of the damages caused to New Sesco by Dicen's competition, he was unable to calculate the amount of damage caused. Any inconsis-

tency in Mr. Bryan's testimony was a matter of credibility for the trial court to resolve. Here, there was sufficient evidence from which the trial court could infer that New Sesco had an inadequate remedy at law.

### B. Validity of the Non–Competition Covenants

 Dicen's main challenge to the propriety of the preliminary injunction is his claim that that the covenants not to compete upon which the injunction was based are unreasonable and unenforceable as a matter of law. If so, New Sesco cannot have established a reasonable likelihood of success at trial. Covenants not to compete are viewed as being in restraint of trade and are therefore not favored by the law. *Young v. Van Zandt,* 449 N.E.2d 300, 303 (Ind.Ct.App.1983). They are also strictly construed against the covenantee. *Id.* Still, such covenants will be enforced where they are reasonable. *Id.* at 303–04. The reasonableness of a covenant is a matter to be decided by the court and ultimately depends upon the facts and circumstances of the particular case. *Id.* at 304. The measure of reasonableness varies depending upon the type of covenant involved. *Id.*

 Covenants not to compete are typically found in both employment contracts and contracts for the sale of a business, and the two differ in how they are treated by the courts. *See id.* Covenants not to compete found in employment contracts are ill-favored at law, whereas noncompetition covenants ancillary to the sale of a business are not as disfavored. *Id.* Non-competition covenants ancillary to the sale of a business are nevertheless subject to the test of reasonableness and will not be enforced if unreasonable. *Id.* As explained by the court in *Fogle v. Shah:*

" 'In the former situation (sale of a business) there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with the buyer. Where the sale of the business includes good will ... a broad noncompetition agreement may be necessary to assure that the buyer receives that which he purchased.... On the other hand, an ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer. Postemployment restraints in such cases must be scrutinized carefully to see that they go no further than necessary to protect an employer's legitimate interests, such as trade secrets or confidential customer information.' " 539 N.E.2d 500, 502 (Ind. Ct.App.1989) (quoting *Alexander & Alexander, Inc. v. Danahy*, 21 Mass.App. Ct. 488, 488 N.E.2d 22, 28 (1986)).

In employment contracts, a non-competition covenant is deemed to be reasonable where: (1) the restraint is reasonably necessary to protect the employer; (2) it is not unreasonably restrictive of the employee; and (3) it is not against public policy. *Young*, 449 N.E.2d at 304. Whether the covenant is unreasonably restrictive of the employee is measured in terms of time, space, and the activity or conduct prohibited. *Id.* In non-competition covenants ancillary to the sale of a business, the covenant is deemed to be reasonable where it is limited to the area of the business involved. *Id.* Reasonable-

ness is again measured in terms of time, space, and prohibited activity. *Id.* With the sale of a business, the interest to be protected relates to the goodwill of the business, and if the restraint is greater than necessary to protect the goodwill, the contract is invalid. *Id.*

 If a covenant is clearly divisible into parts, and some parts are reasonable while others are unreasonable, a court may enforce the reasonable portions only. *Burk v. Heritage Food Serv. Equipment, Inc.*, 737 N.E.2d 803, 811 (Ind.Ct.App. 2000). Under this process, known as "blue-penciling," we strike the unreasonable provisions from the covenant. *Id.* However, when applying the blue pencil, we must not add terms that were not originally part of the agreement. *Id.* Instead, the unreasonable restraints are rendered reasonable by striking out any offensive clauses to give effect to the parties' intentions. *Id.* We may not add any terms to the instruments and must restrict ourselves to the application of existing terms. *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 215 (Ind.Ct.App.1982).

Here, Dicen challenges the non-competition covenants contained in the Purchase Agreement and the Employment Agreement. Although the trial court's findings and conclusions focus mainly upon the provisions of the Purchase Agreement, and the parties' appellate arguments are similarly focused, the trial court concluded that Dicen breached the non-competition covenants contained in both Agreements. We therefore address the validity of the non-competition covenants contained in both agreements, turning first to the Employment Agreement.[4]

---

4. New Sesco contends that the trial court's injunction does not enforce the covenants contained in the Employment Agreement. Appellee's Br. at 23. In his reply brief, Dicen claims to accept New Sesco's "concession" in this regard but maintains his argument that the non-competition clauses in the Employment Agreement are unenforceable as a matter of law. Appellant's Reply Br. at 18.

### 1. *The Employment Agreement*

The Employment Agreement contains several non-competition provisions, one of which states that "[b]oth parties agree that the Corporation would suffer great loss and damage if Employee should for himself or on behalf of any other person, partnership, corporation, organization or other entity perform the same, or substantially the same, service as those he performs for the Corporation." App. at 89. Another provision states that Dicen shall not, without New Sesco's approval, "render services directly or indirectly, for himself or any other ... entity which is engaged in the land remediation business; or (b) use any confidential or proprietary information concerning the business of the Corporation which he has acquired while performing services for the Corporation." *Id.* at 89–90. The Employment Agreement also states that the restrictions contained therein are to "apply throughout the entire United States of America and its territories." *Id.* at 90. However, the evidence most favorable to the trial court's decision reveals that the services Dicen performed for New Sesco did not extend throughout the entire United States and its territories. Indeed, Mr. Bryan testified that the customers for which Dicen provided services while employed by New Sesco were located in Indiana, and "some of the surrounding states," including Kentucky, Tennessee, Wisconsin, Ohio, and perhaps West Virginia. Transcript at 178. Given this, the geographic scope of the non-competition covenant contained in the Employment Agreement is overbroad and unreasonable as a matter of law and cannot therefore be enforced. *See Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 412, 127 N.E.2d 235, 241 (1955) (covenant not to compete was unreasonable to the extent that it purported to restrict gainful employment of appellant beyond the area of his former employment with former employer); *Cap Gemini America, Inc. v. Judd*, 597 N.E.2d 1272, 1288 (Ind.Ct.App. 1992) (non-competition covenant restricting former employees from competing with former employer in area served by any branch office of the employer was unreasonable and invalid where the branch office served Indiana, Ohio, and Kentucky, but employees did not perform services in all three states); *Commercial Bankers Life Ins. Co. of Am. v. Smith*, 516 N.E.2d 110, 115 (Ind.Ct.App.1987) (non-competition covenant restricting competition in all of Indiana was unreasonable and unenforceable where employee worked primarily in northern Indiana), *trans. denied.*

---

Thus, we address whether such provisions are germane to the current appeal.

That part of the preliminary injunction order which limits Dicen's ability to compete with New Sesco closely tracks the language of the covenant not to compete contained in the Purchase Agreement. This is likely why New Sesco claims that the injunction enforces only this covenant. However, the order also states that the trial court "hereby adopts the Findings of Fact and Conclusions of Law as proposed by the Plaintiff...." Appendix at 5. New Sesco's proposed findings and conclusions state in no uncertain terms that "Dicen has breached the Covenant Not to Compete and the non-solicitation covenants contained within the Asset Purchase Agreement and his Employment Agreement." App. at 19. This conclusion, and many others, smack of a final judgment that Dicen has definitively breached the covenants at issue. This, however, was not the issue before the court, which was instead whether or not to enter a preliminary injunction against Dicen pending the final resolution of these matters. Given the nature of the issue before the court, we must conclude that the trial court's conclusion means only that the trial court determined that New Sesco had demonstrated a reasonable likelihood of success at trial on the merits of the claims regarding Dicen's breach of the Purchase Agreement and Employment Agreement. We cannot fault Dicen for attacking this conclusion upon appeal.

■ Here, we are unable to strike these offending provisions and enforce the contract as so modified. If we "blue pencil" the offending provision of the Employment Agreement, the result would be no geographic limitation whatsoever. This would be broader than the stricken limitation. We cannot limit the geographic scope of this covenant without impermissibly adding terms to the agreement. Thus, the non-competition provisions of the Employment Agreement are unenforceable.

### 2. The Purchase Agreement

Dicen focuses his argument upon Article VII of the Purchase Agreement, which contains the covenant not to compete, and which reads as follows:

> "*Section 7.01. Non–Competition Covenant.* Shareholders [i.e., Dicen, Hughes, and Valinetz] and Seller [Sesco] jointly and severally agree that neither the Shareholder nor the Seller shall, for the five (5) year period immediately following the date of Closing, directly or indirectly, in any manner, whether as an individual or as an agent, employee, principal, contractor or affiliate of any other person or trade or business in competition with the Business being purchased by they Buyer [New Sesco] pursuant to this Agreement, contract or in any manner solicit any of the persons or entities identified from time to time. Further, Shareholder and Seller agree that, for the five (5) year period following the date of Closing, neither Seller no [sic] Shareholder shall employ or seek to employ any existing employee of the Business being sold to Buyer whose names are identified from time to time.
>
> *Section 7.02. Reasonableness of Terms.* Seller and Shareholder each ac-

knowledge and recognize that a breach or threatened breach or any violation of this Article VII would give rise to irreparable injury to the Buyer, inadequately compensable in damages and, accordingly, Seller and Shareholder each agree that Buyer may seek and obtain injunctive relief against any such breach, threatened breach or violation, in addition to any and all other available legal remedies, including recovery of monetary damages and reasonable attorney's fees, Seller and Shareholder stipulate and agree that the terms, provisions and covenants of this Article VII are reasonable, in light of all the facts and circumstances surrounding the making of this Agreement. In the event a court determines that any of the terms, provisions, or covenants contained in this Article VII are unreasonable, a court may limit the application of any such term, provision or covenant, or modify any such term, provision or covenant and proceed to enforce this Article VII as so limited or modified." App. at 69–70.

■ Covenants not to compete which are ancillary to the sale of a business reflect the value of the customers' affiliation with the particular business which is part of the bargain sought by the buyer. *Fogle,* 539 N.E.2d at 502. Such goodwill is the protectable interest upon which the covenant not to compete focuses. *Id.* The goodwill of a business is an intangible asset which may be transferred from seller to buyer, and it becomes the buyer's right to expect that the firm's established customers will continue to patronize the purchased business.[5] *Id.* A seller who re-enters the market and competes with the buyer for customers precludes the buyer from receiving all that has been sold. *Id.*

---

**5.** This expectation presupposes that both the buyer's business and the customer's business remain substantially unchanged.

Here, Dicen does not specifically claim that New Sesco did not purchase a protectable interest. Indeed, in his reply brief he admits that New Sesco purchased goodwill from Dicen and his fellow shareholders. Appellant's Reply Br. at 6, 17. Instead, he claims that the restrictions contained in the Purchase Agreement are broader than necessary to protect the interests purchased.[6] To determine whether a covenant not to compete ancillary to the sale of the business is overbroad, we apply the following three-part test: (1) whether the covenant is broader than necessary for the protection of the covenantee in some legitimate interest; (2) the effect of the covenant upon the covenantor; and (3) the effect of the covenant upon the public interest.[7] *Fogle*, 539 N.E.2d at 503. The ultimate concern is whether the covenant is reasonable as to the covenantee and whether it is reasonable as to time, space, and the activity restricted. *Id.*

Dicen makes no argument regarding the temporal length of the restriction contained in the Purchase Agreement, but he does attack the language used as being overly broad and unreasonable as a matter of law.[8] Dicen first complains that the covenant not to compete contained in the Purchase Agreement contains no geo-

graphic limitation. In situations involving a covenant not to compete contained in an employment contract, the lack of a geographic limitation renders the covenant presumptively void. *Vukovich v. Coleman*, 789 N.E.2d 520, 525 (Ind.Ct.App.2003). In covenants ancillary to the sale of a business, courts are "more indulgent" regarding the reasonableness of geographic limitations. *See* John W. Bowers, Stacey L. Katz, Charles W. Black, *Covenants Not to Compete: Their Use and Enforcement in Indiana*, 31 Valp. U.L.Rev. 65, 83 (1996). Regardless, a covenant not to compete which contains no geographic restrictions may be reasonable if it is adequately limited by other means. See *Seach*, 439 N.E.2d at 213 ("as the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases.").

Here, although the covenant contains no geographic limitations, it does state that Dicen is prohibited from soliciting "any of the persons or entities identified from time to time." App. at 69. New Sesco claims that it did identify to Dicen whom he could and could not solicit. Specifically, New Sesco refers to the customer list Dicen gave Mr. Bryan before leaving

---

**6.** Dicen briefly claims that New Sesco failed to identify the entities which he was prohibited from soliciting, amounting to a failure to satisfy a condition precedent. However, the evidence most favorable to the trial court's decision reveals that Mr. Bryan told Dicen before he left New Sesco that Dicen was prohibited from contacting New Sesco's past, present, or prospective customers.

**7.** Dicen makes no cognizable argument regarding the effect upon the public interest of the covenants at issue in this appeal.

**8.** Section 7.02 of the Purchase Agreement states that the parties agree that the terms of the non-competition covenant were reasonable and that the breach thereof entitles New Sesco to injunctive relief. These provisions

do not affect our decision. The reasonableness of the agreement, and therefore its enforceability, is a matter of law for the courts to decide. *Cf. Young*, 449 N.E.2d at 304. We are not bound by the provisions of the covenant declaring itself to be reasonable. Upon analogous reasoning, it has been held that a contractual provision which stated that the employer was entitled to a preliminary injunction was not binding upon courts, for such provisions "would impermissibly remove the determination of whether to grant or deny an injunction from the discretion of the trial court and oust that court's inherent jurisdiction." *Ed Bertholet & Assocs., Inc. v. Stefanko*, 690 N.E.2d 361, 364 (Ind.Ct.App.1998).

New Sesco, an exhibit it offered at the hearing which included additional companies which it wished to prohibit Dicen from soliciting, and the conversation between Mr. Bryan and Dicen wherein Mr. Bryan stated that he did not want Dicen to solicit certain customers of New Sesco. At the hearing, Mr. Bryan variously referred to these customers as "[t]hose clients that we were doing business with and those clients that we were attempting to do business with," "past, current, or future that is prospective customers," and "clients we had done previous tests for[,][c]lients we were currently doing tests for[,] and clients that we were soliciting business for future testing." Transcript at 108, 111, 75. Indeed, the trial court's preliminary injunction order prohibits Dicen from soliciting or contracting "any past or current customer's [of] New Sesco, or companies to whom New Sesco had made proposals, including, but not limited to, all such customers or companies identified by New Sesco up to the date of the evidentiary hearing ... including, but not limited to, those entities identified in Exhibits '4' and '5' introduced at the evidentiary hearing." App. at 6.

 We agree with Dicen that the restriction included in Section 7.01 is too broad. As written, it gives New Sesco effectively unbridled discretion in choosing whom Dicen may solicit. Also, the restriction which New Sesco requested and the trial court granted, i.e., past customers, current customers, and those companies to whom New Sesco had made proposals, is problematic. As noted by Dicen, this court has viewed such restrictions unfavorably in the past.

In *Seach, supra,* the court held unenforceable a covenant not to compete which restricted the former employee from contacting or soliciting "any present, past or prospective client ... of the Firm." [9] 439 N.E.2d at 209. The court held that *present* customers are a protectable interest of an employer. *Id.* at 213. Concerning past customers, however, the court noted that there was no limitation regarding when the past clients may have been customers of the employer. Thus, Seach, the former employee, would have been "prohibited from contacting persons with whom he, or even conceivably his ex-employer, had no contact during the term of Seach's employment." *Id.* at 214. There was similarly no limitation regarding when prospective clients may have been contacted by the former employer. The court noted with some trepidation that contact with prospective clients, even though defined in the contract as a person or business previously contacted at least once by the employer, could have conceivably occurred prior to Seach's employment and without his knowledge. Thus, the court held that the prohibitions against soliciting, contacting, or working for past and prospective clients were too broad and unenforceable.[10] *Id.* See also *Burk,* 737 N.E.2d at 814 (holding that trial court correctly deleted prohibition against soliciting past customers of employer from covenant not to compete).

In *Hahn v. Drees, Perugini & Co.,* 581 N.E.2d 457, 460 n. 3 (Ind.Ct.App.1991), the court cited *Seach* with approval and further explained that a present client is a client who did business with the employer during the employee's employment; a past client is one that did business with the employer before, but not during, the time of the employee's employment; and a pro-

---

9. The non-compete provision was therefore an employment agreement provision and not a purchase agreement provision.

10. The *Seach* court therefore used its "blue pencil" to strike these terms from the covenant, leaving the prohibition against contacting present customers intact. *Id.* at 215.

spective client is one whose contacts with the employer occurred after the employee's employment.[11] Under this standard, the trial court's interpretation of the covenant not to compete contained in the Purchase Agreement and the resulting injunction are overly broad.

As in *Seach*, New Sesco has a protectable interest in prohibiting Dicen from soliciting "current" or "present" customers of New Sesco. Regarding the trial court's restrictions concerning past customers, we observe that Dicen was an employee of New Sesco from the company's creation. Thus, if the definition from *Hahn* is utilized, there are no "past" customers, and the trial court's prohibition against soliciting such is not problematic. The trial court's prohibitions concerning soliciting customers with whom New Sesco had made proposals presents more of a problem. To the extent that this restriction could include "prospective clients" as defined by *Hahn*, i.e. those whose contacts with the employer occurred after the employee's employment, it is overly broad. Dicen may properly be enjoined from soliciting only those customers who had contacts with New Sesco during Dicen's employ. *See Cohoon v. Financial Plans & Strategies, Inc.*, 760 N.E.2d 190, 195 (Ind. Ct.App.2001) (prohibition against associating with those having a previous business relationship with the employer within one year of the termination of the covenant was not overly broad where the former employee had been employed for over two years).

We acknowledge that the non-competition clause of the Purchase Agreement does not readily adapt to the analyses of *Seach* and *Hahn*. Again the provisions in those two cases were ordinary employee-employer contractual provisions.

Here, because Dicen was to become an employee of New Sesco with similar duties to that which he had previously carried out, the Purchase Agreement non-competition provision, as opposed to a valid employment contract provision, could not have reasonably contemplated that he would have no contact with customers. For that reason the Purchase Agreement provision must be construed in the context of that situation. Accordingly, the time at which the provision would become effective must be the time at which Dicen ceased to be employed by New Sesco. Only in this sense does the Purchase Agreement provision become analogous to the employment agreement provisions of *Seach* and *Hahn*. It is in this context then that the definition and scope of the terms "past customers," "present customers," and "prospective customers" must be examined. We hold that under the Purchase Agreement provision before us, "present customers" means any customer acquired during the period of Dicen's employment and who remained a customer at the time of his departure. "Past customers" means any customer who was acquired during Dicen's employment but who was not still a customer at the time his employment terminated. "Prospective customers" means entities to which New Sesco had made overtures or contact during the period of Dicen's employment, concerning a future customer relationship.[12] Our holding today is not to be read as any dilution or deviation from the holdings of *Seach* and *Hahn*, but rath-

---

**11.** As in *Seach,* the *Hahn* provision was in an employment agreement.

**12.** Of course, the parties contemplated that during his employment, Dicen would not be permitted to service or solicit customers for his sole benefit or the benefit of a competitor of New Sesco. The duties he was to perform were certainly contemplated to be for the benefit of New Sesco.

er as a slight refinement or adaptation of those holdings.

Dicen also contests that portion of the covenant which states that he may not "in any manner" solicit the entities "to be identified from time to time."[13] According to Dicen, this restriction would prohibit him from soliciting any of New Sesco's customers for any reason, even in a manner unrelated to his employment with New Sesco. This restriction cannot be read so broadly. Such a restraint would be unnecessary to protect New Sesco's business interests. *See Burk*, 737 N.E.2d at 812 (holding unenforceable covenant not to compete which prohibited former employee from working for competitor of former employer in any capacity). This overly broad language cannot be cured by striking the offending portions. Normally, this would require us to hold that the entire covenant not to compete is unenforceable. *See Young*, 449 N.E.2d at 304. However, as discussed in full below, another provision of the contract avoids resort to such a drastic remedy.

■ Although Dicen admits that the covenant at issue could be given a less restrictive interpretation, as the trial court here did, he maintains that any such attempt to interpret the covenant in a manner more limited than he suggests improperly exceeds our authority under the blue pencil rule. According to Dicen, interpreting the covenant not to compete contained in the Purchase Agreement in a limited manner amounts to imposing a reasonable interpretation upon an unreasonably broad contract or "creat[ing] a reasonable restriction in the guise of interpretation," which we may not do. *See id.*

While we acknowledge the limits of our authority to interpret the contract under the blue pencil rule, we find instructive that the last sentence of Section 7.02 of the covenant contained in the Purchase Agreement states, "In the event a court determines that any of the terms, provisions, or covenants contained in this Article VII are unreasonable, a court may limit the application of any such term, provision or covenant, *or modify any such term, provision or covenant and proceed to enforce this Article VII as so limited or modified.*" App. at 70 (emphasis supplied). Here, the parties, by entering into the Purchase Agreement containing this language, expressed their manifest intent to enter into a covenant not to compete in some form, even if a court determined that the covenant as written was overly broad. Because of this provision, we are not constricted as we otherwise would be by the limits of the blue pencil doctrine.[14] We will simply modify the contract to conform to the limits imposed by the applicable rules of law.

---

**13.** Citing *McGlothen v. Heritage Envtl. Servs., LLC*, 705 N.E.2d 1069, 1072 (Ind.Ct.App. 1999), Dicen claims that New Sesco has failed to demonstrate that Dicen had a "unique competitive advantage or ability to harm the employer." The *McGlothen* court held that such must be shown before the employer is entitled to the protection of a non-competition covenant. *Id.* We note, however, that *McGlothen* involved a covenant not to compete contained in an employment agreement. The covenant which we are currently addressing is ancillary to the sale of a business. For Dicen to re-enter the market and compete with the buyer for customers precludes the buyer from receiving all that has been sold. *Fogle*, 539 N.E.2d at 502.

**14.** We note that the Employment Agreement contains no provision permitting a court to modify its terms and enforce the contract as modified. For this reason, the offending portions of the Employment Agreement cannot be modified, and the covenant not to compete contained therein remains unreasonably broad and unenforceable.

We hereby modify the covenant to prohibit Dicen from soliciting past, present, and prospective customers of New Sesco as we have defined those terms. We also modify the covenant to prohibit Dicen from competing with New Sesco only in the area of business which was sold by Dicen and the other shareholders, i.e. primarily air-stack testing and environmental consulting. Thus, the covenant will operate only in the limited geographic area to which Dicen's activities at New Sesco were limited. The covenant as so modified will not place an undue hardship upon Dicen compared to the potential harm posed to New Sesco.

This result requires us to remand this issue to the trial court in order to determine which of the companies on the lists entered into evidence by New Sesco meet these criteria and to modify the preliminary injunction accordingly.[15]

### C. Trade Secrets

Dicen claims that the trial court erred in concluding that New Sesco's customers' names, addresses, needs, and histories are trade secrets entitled to protection, and that those portions of the preliminary injunction restricting his use of such information are erroneous. As we see it, this is another way of attacking New Sesco's likelihood of success at trial and, thus, the granting of the preliminary injunction. The preliminary injunction order enjoined Dicen from "[u]tilizing, using, disclosing, and/or transmitting any knowledge of New Sesco's customers' names, addresses, needs, and histories, as well as other secret and confidential information regarding

those customers to assist any person, Air Analysis, Inc., or any other company in competing against New Sesco...." App. at 6.

 In reviewing this claim, again we are mindful that the current appeal is from the granting of a preliminary injunction. As such, we reiterate that New Sesco needed only establish a prima facie case at the preliminary injunction hearing. *See Norlund*, 675 N.E.2d at 1149. Whether the parties consider the information at issue proprietary or confidential is of little import, because the question of what constitutes proprietary or trade secret information is a determination for the court to make as a matter of law. *Franke v. Honeywell, Inc.*, 516 N.E.2d 1090, 1093 (Ind.Ct.App.1987), *trans. denied.* The threshold factors for us to consider are the extent to which the information is known by others and the ease by which the information could be duplicated by legitimate means. *Id.*

 New Sesco bases its claims of improper use of trade secrets upon the contractual provisions of the Employment Agreement[16] as well as the Indiana Uniform Trade Secrets Act ("IUTSA"), located at Indiana Code 24–2–3–1. The term "trade secret" is defined by the IUTSA as:

"information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper

---

**15.** Dicen makes a brief argument that the trial court erroneously found that he solicited New Sesco's customers for his benefit while employed by New Sesco, but he fails to cite to the finding which states this. Our review of the trial court's findings reveals only that the trial court found that Dicen was planning to

leave New Sesco while he was employed there and "had contacted customers to advise them of his plans to leave." App. at 12. The evidence supports both of these findings.

**16.** Our review of the Purchase Agreement reveals no provisions dealing with trade secrets.

means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ind.Code § 24–2–3–2 (Burns Code Ed. Repl. 1996).

*See also Hydraulic Exchange & Repair, Inc. v. KM Specialty Pumps, Inc.,* 690 N.E.2d 782, 785 (Ind.Ct.App.1998). Actual or threatened misappropriation of trade secrets may be enjoined. Ind.Code § 24–2–3–3 (Burns Code Ed. Repl.1996); *Hydraulic Exchange,* 690 N.E.2d at 785.

New Sesco claims that, aside from its claim under the IUTSA, the trial court properly enjoined Dicen from using its customer information as defined in the Employment Agreement, the relevant portion of which reads:

"8.1 Except for necessary disclosures made in the ordinary course of the Employee's employment with the Corporation and except as is otherwise expressly authorized by the Corporation in writing, the Employee agrees and promises that the Employee will not at any time, or during the Employee's employment with the Corporation or anytime thereafter, directly or indirectly disclosed [sic] for use, on the Employee's own behalf or on behalf of any third party ... a secret, confidential or proprietary information obtained, received or learned by the Employee during the Employee's employment with the Corporation (including information conceived, originated, discovered or developed by the Employee and including information belonging to or pertaining to the Corporation) including, but not limited to, the following types of information: ideas, concepts, designs, specifications, technical data, for types, documentation, media, codes, programs, technical know-how, methods, procedures, business plans, marketing strategies and plans, sales techniques, forecasts, customer list, customer information (including but not limited to, customer requirements, preferences, past purchases and other relevant data information [sic] ), customer pricing information, supplier list, supplier pricing information, employee list information, processes, formulae, research, development, trade secrets, proposals, projections, and financial information, whether or not the same are, or maybe [sic], patented, copyrighted, registered, or otherwise publicly protected, and whether or not originated or generated by or through the Corporation; *provided, however, that this section 8 shall not preclude the Employee from use or disclosure of information known generally to the public* (provided that the Employee was not, without the Corporation's consent, directly or indirect [sic] the [sic] responsible for such information becoming known generally to public) or from disclosure required by law or court order." App. at 88–89 (emphasis supplied).[17]

Under New Sesco's interpretation of this contractual provision, Dicen would be prohibited from using *any* customer lists or customer information, etc., inasmuch as such information is defined within the provision itself as information which Dicen is prohibited from using (providing that he obtained, received, or learned of such while in New Sesco's employ). Such information would be protected regardless of whether it met the definition of a protectable trade secret as contained in the IUTSA.

---

17. Section 8.2 of the Employee Agreement deals with "documents and records." App. at 89. Here, there was no evidence that Dicen kept any such documents or records belonging to New Sesco, and the trial court's order does not mention this section.

We are not of the mind that contractual provisions may re-define what is and is not a trade secret without regard to the definitions contained in the IUTSA. We recognize that the first section of the IUTSA states that the act "displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, *except contract law* and criminal law." Ind. Code § 34–2–3–1(c) (Burns Code Ed. Repl.1996) (emphasis supplied). However, we do not read this to mean that private parties may simply re-define what is protectable information. To do so would render the IUTSA's definition a nullity, because any employer who wished to have the broadest possible protection from disclosure of any of its information could simply contractually define such as a protectable "trade secret" whether or not this information was generally known, readily ascertainable, or was the subject of reasonable means to maintain its "secrecy." Such contracts could violate the public policy contained in the IUTSA and render it ineffective. To the extent section 8.1 of the Employment Agreement does so, we hold it to be unenforceable. *See e.g., Straub v. B.M.T. by Todd,* 645 N.E.2d 597, 598–99 (Ind.1994) (contractual agreements which contravene public policy of Indiana are void and unenforceable). This leaves us with the question of whether, under the IUTSA, the information which is the subject of the injunction meets the definition of a trade secret.

Dicen claims that the customer information which the trial court enjoined him from using does not meet the IUTSA definition of a trade secret. We agree. First, although the record does support New Sesco's claim that some of the information it seeks to protect is not readily available to the public, much of the information which New Sesco wished to enjoin Dicen from using was readily available

through other means—most importantly IDEM. Mr. Bryan admitted that "a good portion" of the information was available to the public. Transcript at 98–99. Information such as the names of companies who are required to undergo testing, their testing requirements, and their contact information is kept at IDEM and is available to the public through several means, including IDEM's internet web site. This militates against a finding that such information constitutes a trade secret. *Cf. Franke,* 516 N.E.2d at 1093.

Moreover, there was a dearth of evidence regarding New Sesco's efforts to maintain the secrecy of the information at issue. In fact, Mr. Bryan testified that customer information was kept on a computer without password protection, and that every employee of New Sesco had access to the physical copies of such information. Mr. Bryan testified that New Sesco had employment agreements with only two other individuals. He also testified that the potential customers of New Sesco to whom bids were sent were under no obligation to maintain the confidentiality of the bid price. In claiming that it did put forth reasonable efforts to maintain the secrecy of the information, New Sesco claims that Dicen was "the primary person in charge of customer information" and that Dicen was required to sign the confidentiality agreements at issue. We are unable to conclude that this is sufficient. New Sesco refers to nothing else in the record as evidence of its efforts to maintain secrecy.

Without further evidence, we cannot say that the customer information New Sesco sought to protect was the subject of efforts that were reasonable under the circumstances to maintain its secrecy. Such efforts are required by the IUTSA before information may be deemed a trade secret. *See* I.C. § 24–2–3–2. Therefore, New Ses-

co failed to establish prima facie its IUT-SA claim at the preliminary hearing. *See Standard Register Co. v. Cleaver*, 30 F.Supp.2d 1084 (N.D.Ind.1998) (holding that identity of company's current and former customers was not a trade secret under the IUTSA where such information was readily known in the industry and no efforts to protect the alleged secrets were taken). Cf. *Kozuch v. CRA–MAR Video Center, Inc.*, 478 N.E.2d 110, 113 (Ind.Ct. App.1985) (trial court did not err in finding customer list constituted trade secret under IUTSA where list could not have been created by means other than through employer's business operations and where employer took reasonable efforts to maintain secrecy of customer list through strict instructions to the computer programmers and operators, as well as locking up the disks containing the customer list), *trans. denied.* We reverse the trial court's preliminary injunction order to the extent that it concludes that New Sesco has demonstrated a likelihood of success upon its claim that Dicen violated the IUTSA.

## II

### Admission of Evidence

■ Dicen claims that the trial court erred in considering anything other than the contract language in interpreting the Purchase Agreement. Specifically, Dicen claims that New Sesco could not fulfill its obligation to identify which companies Dicen could not solicit by reference to either the lists of companies presented at the hearing or by Mr. Bryan's conversations with Dicen. Dicen correctly notes that the

Purchase Agreement contains an integration clause which states:

"*Section 9.05. Entire Agreement.* This Agreement (and the schedules and Exhibits attached hereto) and the documents, agreements or instruments to be executed or delivered in connection with the Closing of this Agreement, constitute the entire agreement between the parties pertaining to the subject matter contained herein and supersede all prior and contemporaneous agreements, representations, and understandings of the parties. . . ." App. at 71.

The next section of the Purchase Agreement states that "[n]o supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the parties." App. at 71. Dicen claims that reference to either the trial exhibits or Mr. Bryan's conversation violates these contractual provisions and the parol evidence rule.

It is our view that the evidence of which Dicen now complains does not violate these contractual provisions. The lists of companies admitted at trial and Mr. Bryan's conversation with Dicen do not supplement or modify the terms of the contract as written. Instead, this evidence represents New Sesco's efforts to fulfill its obligation to identify the entities which Dicen was prohibited from soliciting under Section 7.01 of the Purchase Agreement.[18]

## III

### Parol Evidence

■ The same can be said of Di-

18. Dicen does not challenge the validity of that portion of the Purchase Agreement which specifically states that the identities of the persons or entities forbidden to Dicen would be provided "from time to time." One would have to infer such argument from his claim that the trial court erred in considering the exhibits submitted and the testimony of Mr. Bryan with regard to the reasonableness of the non-competition covenant. We will not indulge that inference. Accordingly we deem it inappropriate to question the language of Section 7.01 in this regard.

cen's parol evidence rule argument.[19] The parol evidence rule generally prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding terms to a written contract where an integration clause states that the written document embodies the complete agreement between the parties. *Patterson v. Grace*, 661 N.E.2d 580, 583–84 (Ind.Ct. App.1996). The evidence complained of by Dicen does not vary or add terms to the Purchase Agreement. Such evidence is specifically called for in the covenant not to compete. The trial court did not abuse its discretion in admitting and considering such evidence.[20]

## IV

### Unclean Hands

Dicen claims that the trial court erred in excluding evidence he proffered in support of his claims of New Sesco's unclean hands and "bad faith." Appellant's Br. at 27. Specifically, Dicen called David Hughes to testify regarding New Sesco's alleged improper removal of asbestos from the building where its office was located and the impact of such upon Dicen. The doctrine of unclean hands is an equitable rule which states that one who seeks equitable relief, such as a preliminary injunction, must be free of wrongdoing in the same matter before the court. *Ruder v. Ohio Valley Wholesale, Inc.*, 736 N.E.2d 776, 780 (Ind.Ct.App.2000). The matter before the court in the present case was the validity of the covenants not to compete and whether Dicen breached the covenants. For the doctrine of unclean hands to be applicable, the alleged wrongdoing must have an "immediate and necessary relation to the matter being litigated." *Id.* Here, the alleged wrongdoing by New Sesco does not have an immediate and necessary relation to the matter before the court. Therefore, we cannot say that the trial court abused its discretion in excluding Dicen's proffered evidence.[21]

## V

### Injunction Bond

The trial court set a security bond for the issuance of the preliminary injunction in the amount of $10,000. Dicen claims that this amount is insufficient. Indiana Trial Rule 65(C) provides that, "No ... preliminary injunction shall issue except upon the giving of security by the

---

19. We agree with Dicen that New Sesco's waiver argument regarding the parol evidence rule is misplaced. New Sesco contends that Dicen waived any complaint against parol evidence by failing to object to the same at the hearing. However, as stated by our Supreme Court in *Franklin v. White*, 493 N.E.2d 161, 165–66 (Ind.1986), the parol evidence rule is not a procedural rule of evidence, but is instead a rule of preference and of substantive law which prohibits both trial and appellate courts from considering parol evidence even though it was admitted at trial without objection.

20. Dicen briefly argues that the admission of New Sesco's Exhibit 4, consisting of a computer printout from the diskette Dicen gave to Mr. Bryan, violated Indiana Evidence Rule 1002. The trial court's injunction prohibits Dicen from contacting the entities listed in this exhibit. We have instructed the trial court upon remand to determine whether the list of entities in this exhibit improperly includes those with whom Dicen is permitted to solicit given our interpretation of the contract. We therefore fail to see how the admission of this exhibit harmed Dicen.

21. In one sentence of his brief, Dicen cites *Sallee v. Mason*, 714 N.E.2d 757 (Ind.Ct.App. 1999), *trans. denied*, for the proposition that an employer cannot enforce a covenant not to compete if the employer first breaches the contract. Dicen does not further elaborate on exactly how New Sesco breached either of the contracts at issue, and we will address the issue no further. *See* Ind. Appellate Rule 46(A)(8)(a).

applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The trial court's decision in such a matter is reviewed for an abuse of discretion. *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 95 (Ind. Ct.App.2001), *trans. denied; Howard D. Johnson Co. v. Parkside Dev. Corp.*, 169 Ind.App. 379, 389, 348 N.E.2d 656, 662 (1976). The size of the bond should approximate the damage the enjoined party will suffer if it is later determined that the injunction was wrongfully entered. *Titus*, 758 N.E.2d at 95.

Dicen notes that the trial court found that approximately thirty to forty percent of his current customers are former customers of New Sesco. Dicen claims that his current company's "gross monthly business was close to $50,000." Appellant's Br. at 43. That portion of the transcript cited by Dicen is less clear than he claims. At the hearing, Dicen testified that when he was working for New Sesco, the gross monthly revenue of the air-stack testing division was approximately $55,000. When asked if his current company, Air Analysis, Inc., generated a similar amount of gross monthly revenue, Dicen responded, "Close, but not fifty, fifty-five [thousand]." Tr. at 265. Dicen was then asked if, by this answer he meant a lesser amount, to which he responded, "Yes." *Id.*

Thus, the evidence established that Dicen's current *gross* monthly *revenue* was close to, but less than $55,000. Dicen's calculation of his estimated damages are based upon these gross figures. However, there is no indication of what Air Analysis, Inc.'s profits were. Certainly we cannot fault the trial court for not basing the amount of the injunction bond upon the gross revenues of Air Analysis, Inc. Moreover, the trial court found that up to sev-

enty percent of Air Analysis, Inc.'s customers were not former New Sesco customers. Dicen's relationship with these customers would be unimpeded by the injunction. Thus, we cannot say that Dicen has demonstrated that the trial court erred in this regard. Moreover, because we remand this cause to the trial court based upon our modification of the covenant at issue, the scope of the injunction may be subject to change. Thus, the issue of the amount of the injunction bond might also be recalculated by the trial court based upon any such changes.

### Conclusion

In conclusion, the covenant not to compete contained in the Employment Agreement is unenforceable for lack of geographic limitation, and the covenant not to compete contained in the Purchase Agreement is enforceable as modified by this court. This requires us to remand this cause to the trial court to modify the preliminary injunction accordingly. We reverse the preliminary injunction order to the extent that it concludes that New Sesco has demonstrated a reasonable likelihood of success upon its IUTSA claim. The trial court did not err in the consideration of what Dicen claims to be parol evidence, nor did it err in excluding evidence regarding New Sesco's allegedly unclean hands. Lastly, although Dicen has failed to demonstrate that trial court improperly set the injunction bond, it may be necessary to re-evaluate the bond amount upon remand.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.

ROBB, J., and BROOK, Sr.J., concur.